Argued September 9, 1969, affirmed February 27, 1970,
petition for rehearing denied April 27, 1971

FURRER, *Respondent, v.* TALENT IRRI-
GATION DISTRICT, *Appellant.*

466 P2d 605

*Thomas C. Howser,* Medford, argued the cause for appellant. With him on the briefs were Wm. E. Du-

haime, and Brophy, Wilson & Duhaime, and Blackhurst & Hornecker, Medford.

A. *Allan Franzke*, Portland, argued the cause for respondent. With him on the brief were Mautz, Souther, Spaulding, Kinsey & Williamson and Thomas M. Triplett, Portland, and Frohnmayer, Lowry & Deatherage, Medford.

Before PERRY, Chief Justice, and SLOAN, O'CONNELL, GOODWIN* and HOLMAN, Justices.

O'CONNELL, J.

Defendant Talent Irrigation District is a quasi-municipal corporation organized in 1919 for the purposes of delivery of irrigation water in certain portions of the Rogue River Valley. In conjunction with several other districts, it operates canals in Jackson County from Ashland to the vicinity of Medford.

In 1960, as a part of the Talent Project of the Rogue River Basin Development Plan, work was commenced by the Federal Bureau of Reclamation to reconstruct, enlarge and extend certain canals operated by the district. Included in this work was the enlargement of the Talent middle canal and the construction of the west canal extension which lay along the west slope of the Rogue River Valley south of Bear Creek. The district contracted to pay for this construction out of operating revenue, and as part of the repayment agreement transferred title to these canals to the Federal government. Aside from some minor lining work done by district crews under contract with the bureau, the district did not take part in the construction of the canals.

---

* Goodwin, J., resigned December 19, 1969.

In 1961 the district began operating the rebuilt middle canal and in 1963 it opened the new west canal. The district remained the sole commercial operator of the canals since their opening. The Federal government has had nothing to do with the operation of the canals except for minor inspection and repair shutdowns in 1961 and 1962. The government has retained the right to take over operation of the canals should the district's repayment ability become jeopardized.

Plaintiff Furrer is the owner of a 30-acre pear orchard located north and below the Talent canal and the west canal which run parallel, separated by a distance of about 300 feet in the area. Substantially all the property surrounding plaintiff's tract drains onto portions of his land except for the property lying to the northeast. Most of the property in the area is used for the growing of fruit trees, almost entirely pears. Generally, the soil is a heavy clay.

Although there is some evidence that plaintiff's orchard had experienced water problems in the past, it appears that generally the orchard was healthy and of reasonable commercial quality prior to 1961.

After the 1961 irrigation season commenced, plaintiff noticed evidence of a high water table in several areas of his orchard. A high water table will, over time, "drown" the feeder roots of a pear tree and permanently injure it. Plaintiff informed the defendant that he suspected water was seeping from the new Talent canal. No particular injury to the trees had been noted by the end of 1961.

Each year the district ran water through its canals from the middle of April until the middle of September. In 1963 the west canal also went into operation.

The added size of both canals resulted in increased water usage on the properties surrounding the Furrer orchard. There is evidence that Furrer, too, increased his irrigation despite the continuing indications of a high water table on his property.

After 1961 succeeding irrigation seasons produced essentially the same conditions in plaintiff's orchard. Each year additional lining was done until by 1964 substantially all of both canals were lined. From 1962 on plaintiff's pear trees began dying in the areas where the water table was highest. By 1966, when plaintiff brought this action against Talent, approximately 165 of plaintiff's trees were dead and more were dying.

Plaintiff's suit charged that the district had been negligent in running water through its canals when it knew or should have known that water would seep through the canal walls and surrounding soil to plaintiff's injury, in failing to properly line the canals or otherwise prevent seepage, and in failing to construct a run-off ditch or otherwise prevent the seepage from injuring plaintiff.

At the trial both sides introduced voluminous evidence as to the existence and size of leaks in the canal walls, as to the amount and type of irrigation used on neighboring lands and by plaintiff, as to the relationship of the local irrigation and the plaintiff's water problem, as to the necessity of continuing to irrigate a pear orchard when a high water table exists, and as to the facts of damage and the possible ways in which plaintiff might have prevented it.

The jury brought back a verdict for plaintiff in the amount of $20,000.

■ Defendant interposed a plea in abatement on the

ground that the Talent Irrigation District was an "agency" of the United States and therefore under 28 USCA 1346(b) and 2679(a) plaintiff was required to proceed against the United States.[1]

The trial court held that defendant was not an agency of the United States and denied the plea in abatement.

In support of its contention defendant introduced in evidence the contract entered into between defendant and the United States, acting through the Bureau of Reclamation, providing for the construction and enlargement of the Talent project by the United States. Under this contract a considerable amount of control was vested in the United States. Thus it was provided that the title to all project works was to be vested in the United States; the United States would plan and supervise the construction and repair of the canals; upon completion of the project the United States would retain the right of inspection to determine whether the works were operated in accordance with the terms of the contract; no substantial change in defendant's facilities could be made without the consent of the

[1] 28 USCA 2679(a) provides: "The authority of any federal agency to sue and be sued in its own name shall not be construed to authorize suits against such federal agency on claims which are cognizable under section 1346(b) of this title, and the remedies provided by this title in such cases shall be exclusive."

28 USCA 1346(b) provides: "Subject to the provisions of chapter 171 of this title, the district courts, together with the United States District Court for the District of the Canal Zone and the District Court of the Virgin Islands, shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."

United States; the United States would have the right to determine the amount of assessments and toll charges under certain circumstances and to turn off water when operation and maintenance payments to the United States were in arrears. There were other provisions reserving to the United States control over the project.

On the other hand, the actual operation of the canal as a commercial enterprise for the delivery and sale of irrigation water was carried on by defendant. Thus the contract provided that subject to the government's right to take possession for purposes of construction and for other purposes specified in the contract, defendant was "to continue to care for and operate and maintain" the works used in the distribution of irrigation water.

The trial judge concluded that the provisions of the contract reserving to the United States control over the construction and operation of the project were simply designed to protect the government's investment in the construction and repair of the irrigation system and were not intended to reserve to the United States the control over the business of distributing water to the various customers in the irrigation district. We agree with this interpretation of the contract.

An agency of the United States within the meaning of the Federal Tort Claims Act is defined in USCA § 2671, as follows:

> "As used in this chapter [Chapter 171] and sections 1346(b) and 2401(b) of this title, the term—
> " 'Federal agency' includes the executive departments and independent establishment of the United States, and corporations primarily acting as, in-

strumentalities or agencies of the United States but does not include any contractor with the United States."

Under this definition the Talent Irrigation District is not a federal agency unless it is regarded as primarily acting as an instrumentality or agency of the United States.

There is no doubt that the United States had an interest in providing adequate facilities for the distribution of irrigation water in the Talent Irrigation District. That interest, however, represented the broad concern for the reclamation and permanent preservation of lands for agricultural purposes throughout the various states. The United States did not, through its participation in financing and supervising the construction of the Talent project, purport to go into the business of supplying water to farmers in the area. It seems clear that its contractual reservation of control was intended solely to secure the repayment of its investment in the project. In all other respects the Talent Irrigation District carried out the usual functions which characterize the operation of irrigation districts generally in Oregon.

█ Talent was created before it entered into the contract with the United States and it came into existence as an irrigation district not to carry out any of the policies of the United States but to serve the interests of the farmers in the area. Its character and function was no different than the other irrigation districts in Oregon similarly created, including those having no contract with the United States for the construction of irrigation projects. It was primarily a local organization working in furtherance of local interests. We hold that defendant was not a federal

agency within the meaning of the Federal Tort Claims Act.[2]

■ Defendant further contends that even if the district is not an agency of the United States, nevertheless the action should be abated because by the terms of the contract the United States obligated itself to pay damage claims under certain circumstances including the circumstances in the present case and therefore plaintiff's claim was directly against the United States. We do not accept defendant's interpretation of the contract; the obligation of the United States related only to damage which resulted from construction activities and did not extend to damage arising out of the operation of the canals by the district. The trial court properly denied defendant's plea in abatement.

Error is assigned for permitting plaintiff to amend

---

[2] We have found the cases from other jurisdictions of little assistance. A few cases can be regarded as expressing the view which we have adopted, that is, that an agency is not a federal agency unless its operation is designed to carry out a federal function. See, e.g., Scott v. United States, 337 F2d 471 (5th Cir 1964) (Hunt club on military reservation not a federal agency because not intended to provide essential morale and recreational facilities for military installation); D. R. Smalley & Sons, Inc. v. United States, 372 F2d 505 (U.S. Ct. Cl. 1967) (Government grants and consequent government supervision of spending held not enough to make recipient a federal agency). Compare United States v. Holcombe, 277 F2d 143 (4th Cir 1960) (self-supporting Naval Officer's Mess a federal agency because it is an "integral part of the military establishment"); Goddard v. District of Columbia Redevelopment Land Agency, 287 F2d 343 (D.C. Cir 1961) (redevelopment of nation's Capital by Redevelopment Agency carries out policy of the United States, therefore is a federal agency).

Schetter v. Housing Authority of City of Erie, 132 F Supp 149 (W.D. Pa 1955) relied upon by defendant, involved an agency established especially to carry on a federal housing program. Malone v. El Paso County Water Improvement District, 20 SW2d 815 (Tex Civ App 1929), also relied upon by defendant, involved the direct participation of the federal government in the water delivery process.

his complaint after the evidence was taken and prior to the submission of the case to the jury. The trial court permitted plaintiff to amend his complaint by adding a specification that defendant was negligent "in running water through said canals when defendant knew or should have known that the material through which said canals were constructed was insufficient and inadequate to contain said water or prevent its escape onto the property of plaintiff."

It is first contended that there was no evidence to support the amendment. We find that there was sufficient evidence that water leaked from the canal and found its way to plaintiff's property. It is next argued that this evidence was received over defendant's objection and that when this is the case an amendment is not proper.

If evidence is introduced which goes beyond the pleadings in the sense that it relates to a cause of action or defense not pleaded, and objection is made to it, an amendment to the pleadings cannot be allowed.[8] But if the evidence is within the scope of the pleadings, an amendment is permissible. In the present case the evidence related to one aspect of defendant's alleged negligence and therefore fell within the cause of action based upon defendant's negligence. Defendant did not object to the evidence on the ground that it was outside the scope of the pleadings.[9] There was sufficient evidence to support the amendment and

[8] Wood v. Southern Pacific Co., 216 Or 61, 72, 337 P2d 779 (1959); Tracy and Baker v. City of Astoria, 193 Or 118, 237 P2d 954 (1951); Elliott v. Mosgrove, 162 Or 507, 534, 91 P2d 852, 93 P2d 1070 (1939); 71 CJS, Pleading § 285f.

[9] Defendant relies on Powell v. Powell, 181 Or 675, 184 P2d 373 (1947). In that case, however, the proposed amendment would have injected an entirely new issue into the case. That is not true in the present case.

it was, therefore, proper for the trial court to allow it. Defendant's other arguments in support of this assignment of error are without substance.

The remaining eighteen assignments of error present a number of unusually difficult questions for review. A part of the difficulty arises out of the fact that the theory of plaintiff's case and the theory of defendant's defense were not clearly identified in the pleadings or during the course of the trial. We are not informed, therefore, whether the invasion of plaintiff's interest was regarded as a trespass or as a nuisance. The case was tried and submitted to the jury simply on the issue of defendant's negligence.[9] However, the ambiguity as to the character of plaintiff's interest injected itself into the case in several respects and at various stages of the trial, as will become apparent in our examination of the assignments of error.

We shall first consider the assignments of error relating to the trial court's instruction or failure to instruct on various aspects of negligence and causation.

It is contended that the court erred in failing to give the following instruction:

"On the question of what is reasonable conduct in determining whether a party's actions may constitute negligence, you are instructed that the fact that a party's alleged conduct involves some risk of harm to the physical condition of land rather

[9] The briefs treat negligence as if it were a coordinate with trespass and nuisance. As explained in the Restatement of Torts, Introduction to Chapter 40 at 221 (1939), negligence describes the defendant's conduct whereas trespass and nuisance describe the invasion of plaintiff's interest in land. Thus either a trespass or nuisance may arise out of intentional, negligent, reckless, or ultrahazardous conduct.

than bodily harm to a person is of importance in applying these rules. In order that a party's conduct may be called negligent, the risk which it should realize as involved therein must be unreasonable. In determining the unreasonable character of the realizable risk, the value which the law attaches to the interest imperilled is an important factor. Thus a party's conduct may have a sufficient social utility to justify the creation of a certain quantum of risk to the physical condition of land, although conduct involving a similar risk of bodily harm would be unreasonable. You must, in effect, balance the respective interests of the parties in determining the reasonableness of conduct which is alleged to be negligent in light of what a reasonable prudent person would do or not do under the same or similar circumstances."

Defendant argues that in an action based upon negligence the defendant is entitled to have the jury informed that it should take into consideration the social utility of defendant's conduct and the difference in the character of the risks of harm to land and to persons. Defendant's requested instruction is adopted from the following language in 2 Restatement, Torts § 497, p. 1287 (1934) quoted with approval in *Kaylor v. Recla,* 160 Or 254, 260, 84 P2d 495 (1938):

" 'While the rules are the same, the fact that the actor's conduct involves a risk of harm to the physical condition of land or chattels rather than bodily harm is often of importance in the application of these rules. In order that the actor's conduct may be negligent, the risk which he should realize as involved therein must be unreasonable, see § 282. In determining the unreasonable character of a realizable risk the value which the law attaches to the interest imperilled is an important factor (see § 293). Thus, the actor's conduct may have a sufficient social utility to justify the creation of a certain quantum of risk to the physical

condition of land or chattels although conduct involving a similar risk of bodily harm, particularly bodily harm of a serious character would be unreasonable.' "

■ ■ All would agree that the social utility of the defendant's conduct is a factor in determining whether the defendant is negligent.[6] And it is also axiomatic that the question of defendant's negligence is normally for the jury.[7] It does not follow that in every case the jury has the power to exonerate the defendant from liability because it feels that the social value of the

---

[6] "Where an act is one which a reasonable man would recognize as involving a risk of harm to another, the risk is unreasonable and the act is negligent if the risk is of such magnitude as to outweigh what the law regards as the utility of the act or of the particular manner in which it is done." Restatement (Second) of Torts, § 291, p. 54 (1965).

"In determining what the law regards as the utility of the actor's conduct for the purpose of determining whether the actor is negligent, the following factors are important:

"(a) the social value which the law attaches to the interest which is to be advanced or protected by the conduct; * * *." Restatement (Second) of Torts, § 292, p. 56 (1965).

See also 2 Harper & James, The Law of Torts, § 16.9, p. 932 (1956); Morris on Torts, Ch 4, § 1, p. 49-50 (1953); Prosser, The Law of Torts, Ch 5, § 31, p. 151 (3d ed 1964).

[7] "In an action for negligence the jury determines, in any case in which different conclusions may be reached on the issue:

"(a) the facts,

"(b) whether the defendant has conformed to the standard of conduct required by the law, * * *." Restatement (Second) of Torts, § 328C, p. 154-55 (1965).

"Where there is *some* issue for the jury, the law places principal reliance upon the court's instructions to keep the jury within their theoretical bounds. It seeks in this way to guard against the jury's improper use of facts which come under their observation, or of assumptions which are theoretically unwarranted * * *. [The court] will lay down the general standard for evaluating conduct and tell the jury whether or not they are at liberty to conclude that it is met by any given combination of facts which may be found from the evidence." 2 Harper & James, The Law of Torts, § 15.4, p. 885-86 (1956).

defendant's conduct outweighs the harm which defendant has visited upon the plaintiff. If the defendant, while operating a loaded school bus, fails to keep a proper lookout and injures plaintiff, the operator of a motor vehicle, who has terminal cancer and is on his way to make a sale of narcotics, the theory of negligence does not permit the jury to decide for the defendant because it thinks that the furtherance of education has greater social value than the delivery of narcotic drugs or the plaintiff's short and pain-ridden life. In the example given the law looks only at the social value of driving automobiles generally and not at the purpose of the journey. It is the court, not the jury, that weighs such general values and sets the general standards of conduct.⑧

In setting these general standards, the courts have established the principle that if the plaintiff's land is harmed by the conduct of the defendant, the latter cannot escape compensating the plaintiff for the harm simply by showing that the defendant's use had a greater social value than the plaintiff's. Thus, in the present case it is immaterial that defendant's conduct in the operation of the canals was of great social value in that it would substantially benefit the other farmers in the area and the public generally, far outweighing the harm done to plaintiff alone. A landowner does not have to contribute to others a part of the value of his land without compensation, even if it is for a public purpose. The requested instruction, in effect, would have told the jury that it could deny plaintiff recovery if it decided that the social value

⑧ "Once the existence of a legal duty is found, it is the further function of the court to determine and formulate the standard of conduct to which the duty requires the defendant to conform." Restatement (Second) of Torts, § 328B, comment f, p. 153 (1965).

of operating the canal was sufficiently great. This would clearly have constituted reversible error.[9]

The court gave the following instruction:

"If you find from the preponderance of the evidence that defendant was negligent in at least one of the particulars charged in plaintiff's amended complaint, and further find from a preponderance of the evidence that the negligence of the defendant was a substantial factor in causing damage to plaintiff, the defendant would be liable for all the damages you find the plaintiff has suffered even though the acts of others might also have contributed to said damage."

■ Defendant attacks the instruction on several grounds. First, it is argued that the instruction improperly employs the substantial factor test as a test for so-called *legal* cause or proximate cause, when it should have been employed only as a test for *factual* cause. The proper use of the substantial factor test is explained in Prosser on Torts, § 49, p. 287 (3d ed 1964), as follows:

"* * * As applied to the fact of causation alone, the test is of considerable assistance, and perhaps no better guide can be found. But when the 'substantial factor' is made to include all of the ill-defined considerations of policy which go to limit liability once causation in fact is found, it has no more definite meaning than 'proximate cause,' and it becomes a hindrance rather than a help. It is particularly unfortunate in so far as it suggests

---

[9] Thornburg v. Port of Portland, 244 Or 69, 74, 415 P2d 750 (1966) is to the same effect. In that case we said: "The error below was in telling the jury in effect to consider the utility of the airport in deciding whether the plaintiff's property had been depreciated in value by the defendant's activities. This notion is wholly inconsistent with the law of eminent domain, and had no place in the jury's consideration of a decrease in fair market value."

that the questions involved are only questions of causation, obscuring all other issues, and as it tends to leave to the jury matters which should be decided by the court. Some courts which have once proclaimed adherence to it as such a general catch-all formula have been compelled to reject it later, and the 1948 revision of the Restatement has limited its application very definitely to the fact of causation alone."

Assuming that the instruction was subject to the criticism defendant now levels at it, the criticism was not clearly made the basis of defendant's exception, if it was made at all. Even if the instruction is regarded as erroneous for the reasons now stated by defendant, we do not regard the defect as the foundation for reversible error in this case.

■ Defendant also excepted to the instruction on the ground that the trial court failed to define the term "substantial factor." The term "substantial factor" expresses a concept of relativity which is difficult to reduce to further definiteness. Little, if anything, can be done with words to help the jury decide how much causal relationship must exist between conduct and damage before it constitutes a basis for recovery. As the Restatement (Second) of Torts, § 431, comment a, p. 429 (1965) explains:

"* * * The word 'substantial' is used to denote the fact that the defendant's conduct has such an effect in producing the harm as to lead reasonable men to regard it as a cause, using the word in the popular sense, in which there always lurks the idea of responsibility, rather than in the so-called 'philosophic sense,' which includes every one of the great number of events without which any happening would not have occurred."

We doubt whether an explanation such as this would

materially enlighten the jury. The exception is not well taken.

Defendant requested an instruction on contributory negligence which the trial court refused to give. This is assigned as error. The court did, however, give the following instruction:

> "I instruct you that a person whose property has been damaged by the alleged wrongful acts of another is bound to exercise reasonable care and diligence to avoid loss and to minimize the damages, and he may not recover for losses which could have been prevented by reasonable efforts on his part."

It is defendant's position that even assuming the seepage from its canal increased the water table in plaintiff's land, plaintiff contributed to this increase by irrigating his land and that he was negligent in doing so.

■■ The basis for the trial court's refusal to submit the issue of contributory negligence is not clear from the record. The court regarded as significant the fact that "the acts which gave rise to the seepage in this case were prior to any of those of the plaintiff." The fact that the defendant's negligence is prior in time to plaintiff's negligence does not, of course, preclude the application of the theory of contributory negligence.[9] If, however, defendant's conduct taken alone gives rise to legal liability and thereafter plaintiff could avoid some of the damage by reasonable conduct, defendant is not liable for that part of the damage that could be avoided. This is the rule of "avoidable consequences."[10]

---

[9] Restatement (Second) of Torts, § 478, comment a (1965).
[10] Prosser, The Law of Torts, § 64, p. 433 (3d ed 1964).

█ In the present case there was evidence to establish that defendant's canals were the source of a substantial amount of water which found its way to plaintiff's land. There was also evidence that defendant knew or had reason to know that the water was seeping into plaintiff's land. We have, then, an intentional intrusion which, if all other factors are present, could constitute an interference with plaintiff's exclusive possession and give rise to an action of trespass or an interference with the reasonable use and enjoyment of plaintiff's land and give rise to an action of nuisance.

██ Accepting the traditional law of trespass, the tort would be complete even though no actual harm resulted to plaintiff's land.[@] The plaintiff's subsequent

---

[@] Restatement (Second) of Torts, § 163 (1965). Liability is imposed for a negligent intrusion only if it causes harm to the land. Restatement (Second) of Torts, § 165 (1965).

In Emison v. Owyhee Ditch Company, 37 Or 577, 581, 62 P 13 (1900) where plaintiff sought recovery for the loss of crops alleged to have been caused by defendant's *negligence* in permitting water from its ditch to overflow plaintiff's lands, the court said: "Notwithstanding she [plaintiff] may have been injured in part by her own act, the defendant would be liable, *at least in nominal damages,* if by its carelessness the overflow of her land was increased." Thus, even a negligent trespass was regarded as giving rise to liability for nominal damages and that being so, contributory negligence would not be a defense. (Emphasis added.)

See, however, Loe v. Lenhard, 227 Or 242, 248, 362 P2d 312 (1961), where this court, in discussing the imposition of strict liability based on an extra hazardous activity, commented:

"* * * The rationale of the Restatement in limiting liability for unintended invasions of land to actual damages flowing from negligent or extra hazardous conduct commends itself to this court and is consistent with our own cases on related problems."

The court referred to §§ 158 and 165, 1 Restatement of Torts 359 and 390 (1934). The basic content of these sections has been carried over in the Restatement (Second). See Restatement (Second) of Torts § 158, p. 277 and § 165, p. 300 (1965).

negligent conduct would not, in such case, vitiate defendant's liability but could, of course, reduce the plaintiff's recovery under the rule of avoidable consequences. The trial court's refusal to instruct on contributory negligence could be upheld on the foregoing analysis.

■ Even though contributory negligence is recognized as a defense to trespass arising solely out of negligent conduct, the defense should not be available where liability would exist even if there were no negligence. In discussing the defense of contributory negligence to a nuisance arising out of negligence, 2 Harper & James, The Law of Torts, § 22.8, p. 1220, n. 9 (1956), comments as follows:

> "It is often said that contributory negligence is a defense to a nuisance arising out of negligence. See, e.g., Harper, Law of Torts 394 (1933). But this should not be true of a case where defendant would be liable for the condition he created even if there were no negligence. Where defendant is strictly liable, though innocent, his defenses are surely not increased by adding his negligence to the case. The statement referred to, we submit, has no proper application to the field of private nuisance."

We think this reasoning is equally applicable in the field of trespass.

If the invasion of plaintiff's interest is treated not as an intentional trespass but as an intentional nuisance, the analysis would be the same.

Where a nuisance is grounded on negligence the general rule is that contributory negligence is a defense.[⑧] However, it would seem from the language in

---

[⑧] 2 Harper & James, The Law of Torts, § 22.8, p. 1224 (1956).

*Emison v. Owyhee Ditch Company,* 37 Or 577, 62 P 13 (1900), referred to above, that even if the nuisance is grounded in negligence the defense of contributory negligence is not available. And cases from other jurisdictions reflect this same tendency to reject the doctrine of contributory negligence in cases where the defendant interferes with the landowner's use and enjoyment of his land.[⑨]

This may be so because, as observed in 2 Harper & James, § 22.8, pp. 1220-21 (1956), these cases "seldom in fact present any act or omission on plaintiff's part which is comparable to contributory negligence in the ordinary accident case." And so, generally, the law is unwilling to characterize as negligent the "use by plaintiff of his own land in a way that foreseeably increases his exposure to the nuisance." To characterize the plaintiff's conduct as negligent "would require plaintiff to make an unreasonable sacrifice to avoid the consequences of an admitted wrong. He would have to refrain, for instance, from planting to crops that part of his land which was threatened with flood by defendant's inadequate culvert * * *."

It has been suggested, therefore, that "[a] sounder basis for excluding contributory negligence here is to treat defendant's activities in these cases as the kind one engages in at peril of having to compensate his neighbors for any unreasonable interference which his activities cause to their enjoyment of their own land."[⑩]

The doctrine of contributory negligence should be held within the narrowest limits. Our own cases, as well as those in other jurisdictions, have restricted

---

[⑨] 2 Harper & James, The Law of Torts, § 22.8, p. 1220, n. 9 (1956).

[⑩] 2 Harper & James, The Law of Torts, § 22.8, p. 1220 (1956).

the application of the doctrine where the plaintiff's use of his own land is involved.

In the present case the jury was instructed that plaintiff was bound to exercise reasonable care and diligence to avoid loss and to minimize the damages and that he could not recover "for losses which could have been prevented by reasonable efforts on his part." This instruction was sufficient to give to defendant all the protection it deserved.

■ Error is assigned for the trial court's refusal to sustain an objection to a hypothetical question put to Robert A. Work, plaintiff's expert witness, who was called to establish that the canals were the source of the high water table on plaintiff's land. The objection to the question was made principally on two grounds: (1) the witness was asked to assume that the irrigation practice in the surrounding area remained approximately the same up to 1964, when in fact there had been a substantial increase in the irrigation of surrounding land after 1960; (2) the question did not refer to the possible effect of defendant's efforts to line the canals upon the possibility of seepage. At the point in the trial when the hypothetical question was asked, no evidence had been adduced as to whether there had been changes in the irrigation practices on surrounding land.

It is our opinion that the overruling of the objection was not reversible error. The witness, an engineer with expertise in orchard drainage, testified at great length with respect to his detailed examination of the drainage of the land in and near plaintiff's orchard. He testified that the canals were the source of the seepage causing the high water table on plaintiff's land. The witness was carefully and extensively cross-examined on the possible effect that the irriga-

tion of surrounding land would have upon the water table. His testimony indicated that he had considered the irrigation of surrounding land as a possible source of the high water table but concluded from the various tests made in the area that such irrigation could not have been the source. This being the manner of his reasoning, the changes in the irrigation practices on the surrounding land would be immaterial in arriving at his conclusion. The same can be said with respect to the testimony relating to the effect of the lining on the seepage. Here again the witness' conclusions were based upon his own experiments and observations. He indicated on cross-examination that he had sufficient data to support his conclusion that the canals were the source of the water without regard to the effect of the lining.

We are, in effect, saying that the evidence elicited from Work is not to be tested by the rules relating to the use of hypothetical questions because Work was asked a question which he could answer upon the basis of his own personal observations and without reliance upon evidence adduced by others.[10] If the inferences he drew as an expert were inadequate, it was not because he was assuming hypothetical facts which were not supported by evidence but for some other reason.

Defendant presents six assignments of error relating to the law of damages.

Plaintiff's evidence tended to show that in 1961, after defendant began carrying water in the newly constructed canal, the water table in his land and in the surrounding area began to rise. In 1962 some of plaintiff's pear trees began to die as a result of the

---

[10] Foott v. Lindstrom & Feigenson, 143 Or 309, 312, 22 P2d 321 (1933).

high water table. Thereafter, until the time of trial, other trees died from the same cause. The trial court ruled that the two-year statute of limitations was applicable to plaintiff's action.

■ Defendant argues that plaintiff's action must fail because plaintiff did not show what part of the total damage arose within the two-year period.

Since plaintiff has not cross-appealed we may assume, without deciding, that the two-year statute of limitations adopted by the trial court is applicable to this action.⑳ As we have already noted, some of plaintiff's trees died more than two years prior to the commencement of this action. Plaintiff would not be entitled to recover damages based upon the loss of those trees. However, we have concluded that it is impossible to determine from the evidence presented what part of the damage occurred before and what part occurred after the two-year limitation period. It becomes necessary, then, to decide whether plaintiff or defendant has the burden of segregating the damage barred by the statute of limitations from the damage falling within the limitation period.

■ ■ The cases on this question are in conflict. The statute of limitations is an affirmative defense which must be pleaded in the answer unless it appears from the face of the complaint that the action is

---

⑳ Nor is it necessary for us to decide whether the continuing character of defendant's intrusion would permit plaintiff to recover for the total diminution of the value of his land even though a part of the diminution was attributable to defendant's conduct antedating the commencement of the limitation period. See Hotelling v. Walther. 169 Or 559, 130 P2d 944 (1942). *Compare* Reynolds Metals Co. v. Yturbide, 258 F2d 321 (9th Cir 1958) with Martin v. Reynolds Metals Co., 221 Or 86, 342 P2d 790 (1959), cert. denied 362 US 918, 80 S Ct 672, 4 L Ed2d 739 (1960).

barred.[19] And the burden of proof is on the defendant to sustain the defense.[20] If the defense is partial only, barring only a part of the damage, defendant has the burden of proving what part of the damage occurred before the running of the limitation period.[21] The obligation to segregate the damage should fall upon the wrongdoer and not upon the person he has harmed.

Defendant presents several other interrelated assignments of error involving the law of damages which raise questions of the admissibility of evidence, sufficiency of proof, the apportionment of damages caused in whole or in part by seepage from the neighboring lands, variance in pleadings and proof, and the validity of certain instructions. Considerable confusion attended the raising and disposition of these questions at trial. We have spent an inordinate amount of time attempting to unravel the arguments on the various points raised on appeal to determine if reversible error was committed. We have concluded that these assignments of error are without merit.

---

[19] Hewitt v. Thomas, 210 Or 273, 310 P2d 313 (1957); Dutro v. Ladd, 50 Or 120, 91 P 459 (1907).

[20] See Scott v. Christenson, 46 Or 417, 419, 80 P 731 (1905).

[21] In accord: Sanders v. Merchants State Bank of Centralia, 349 Ill 547, 182 NE 897, 903 (1932); Girson v. Girson, 112 Mont 183, 114 P2d 274 (1941); Block v. Briendel, 5 App Div2d 1007, 174 NYS2d 389 (1958); Buck v. Newberry, 55 W Va 681, 47 SE 889 (1904). See also Golden v. Lerch Bros., 203 Minn 211, 281 NW 249 (1938).
Contra: Parro v. Fifteen Oil Co., 26 So2d 30 (La 1946); Howell v. City of Dothan, 234 Ala 158, 174 So 624, 628 (1937).
Other cases relied upon by defendant are basically interpretations of the state of the evidence in the particular trials involved and do not clearly place the burden on either side. O'Hair v. California Prune & Apricot Growers Assn., 130 Cal App 673, 20 P2d 375 (1933); Skelly Oil Co. v. Humphrey, 195 Okla 384, 158 P2d 175 (1945); Cincinnati, New Orleans & Texas Pacific Rwy. Co. v. Roddy, 132 Tenn 568, 179 SW 143 (1915).

■ The jury was instructed to arrive at the amount of damages "by comparison of the value of plaintiff's real property immediately prior to the alleged acts or omissions of the defendant with the value of the plaintiff's real property following the alleged acts or omissions of the defendant. * * * The measure of damages for injury to real property is the difference in the value of the property following the damage as compared to the value prior to the damage, in other words, how much less is the value of the property in its present condition than was its value before the damage alleged began. Although you may not award plaintiff any sum for any items other than the difference in the value of the real property, in reaching that sum you are entitled to take into consideration the value of land and the trees on the land as crop producing trees and may consider such things as the nature of the individual trees damaged, their age and condition and their crop producing capacity."

This instruction, keying the damages to the difference in the value of the land before and after the injury, is in accord with the general theory of damages where fruit trees are damaged by the defendant's tortious conduct.[2] In these circumstances plaintiff is not limited, as defendant contends, to damages represented by the cost of restoration and loss of use.

Defendant argues that even assuming the instruction was sound, there was no evidence to support it since all of the evidence related to the value of the land with and without the injury rather than before and after the injury to the land. Defendant makes this point in an assignment of error charging that

[2] McCormick on Damages, § 126, p. 491 et seq (1935); 69 ALR2d 1334, 1365 (1960).

there was a variance between plaintiff's pleading (which sought damages on the theory expressed in the instruction) and the proof which, it is said, showed only the value of the land with and without the injury.

Defendant's argument is based upon the assumption that plaintiff's complaint expressly sought recovery only for the difference between the value of the land just before the time of the initial injury, consisting of the loss of some of the trees, and the value of the land after such injury.[29]

The injury to the land was a continuing one, both in the sense that the death of each tree was brought about by a slow process of root damage and also in the sense that the various trees died over the period from 1962 to the time the action was brought. Thus, the diminution in the value of the land was gradual and incremental, no part of which was readily measurable at any particular time. It is not reasonable to read plaintiff's complaint as describing the injury or the value of the land at the beginning of this gradual process. Plaintiff simply sought to describe the loss

---

[29] The complaint contained the following allegations:

"* * * [C]ommencing in the fall of 1960 and subsequent thereto, defendant carried on construction * * *.

"* * * That thereafter the defendant has at various times conveyed or collected large volumes of water in said canal and/or canals and that as a direct and proximate result of the conveyance or collection of water in said canals, water has run and seeped from said canal or canals onto the real property of the plaintiff, causing injury and damage to the real property of the plaintiff and to the orchard planted thereon and decreased the productivity of said orchard. * * *

"That prior to the aforesaid escaping of defendant's waters through and upon the plaintiff's property, said property had a value of approximately $25,000 in excess of its value following said escape of waters and that injury and damage from said waters to the plaintiff is continuing and increased. That the plaintiff asks for leave of court to amend his complaint at the time of trial to allege the damages incurred to date of trial."

in terms of the difference in the value of the land with and without the final injury at the commencement of the action. Plaintiff's evidence supported this theory of damage. Therefore there was no variance between pleading and proof.

As we have noted, the instruction to the jury related the damages to the difference between the value before and after the injury. We think that the jury would understand this to mean the difference between the value of the land without the injury (i.e., before the injury in its complete stage diminished the value of the land) and the value of the land after the complete injury.

■ The trial judge properly sustained plaintiff's objection to evidence purporting to show the price plaintiff paid for the orchard in 1958. Because of the continuing nature of the injury the applicable measure of damage was the difference at the time of trial between the value of the damaged orchard and its value if it had not been damaged. Therefore, the value in 1958 was irrelevant. This was a sound basis for the court's ruling.

We have carefully examined the other assignments of error and find them without merit.

The judgment of the trial court is affirmed.