438 June 13, 2024 No. 21

IN THE SUPREME COURT OF THE
STATE OF OREGON

STATE OF OREGON,
*Respondent on Review,*

*v.*

ERIK JOHN MEISER,
*Petitioner on Review.*

(CC CR1201547) (CA A166534) (SC S070059)

On review from the Court of Appeals.*

Argued and submitted September 14, 2023.

Daniel J. Casey, Portland, argued the cause and filed the briefs for petitioner on review.

Joanna R. Hershey, Assistant Attorney General, Salem, argued the cause and filed the brief for respondent on review. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Flynn, Chief Justice, and Duncan, Garrett, Bushong, James and Masih, Justices, and Nakamoto, Senior Judge, Justice pro tempore.**

DUNCAN, J.

The decision of the Court of Appeals is reversed, and the case is remanded to the Court of Appeals for further proceedings.

Bushong, J., concurred and filed an opinion, in which Nakamoto, S.J., joined.

James, J., concurred and filed an opinion, in which Masih, J., joined.

_____

  * Appeal from Clackamas County Circuit Court, Katherine E. Weber, Judge. 323 Or App 674, 524 P3d 130 (2023).

  ** DeHoog, J., did not participate in the consideration or decision of this case.

**DUNCAN, J.**

This criminal case requires us to construe ORS 161.295, which defines the "guilty except for insanity" (GEI) defense. Subsection (1) of ORS 161.295 provides that

> "[a] person is guilty except for insanity if, as a result of mental disease or defect at the time of engaging in criminal conduct, the person lacks substantial capacity either to appreciate the criminality of the conduct or to conform the conduct to the requirements of law."

By its terms, ORS 161.295(1) requires a connection between the person's lack of capacity and the person's mental disease or defect: The lack of capacity must be "a result of" the mental disease or defect. The issue in this case concerns the meaning of "as a result of."

For the reasons explained below, we conclude that "as a result of" must be given its plain, natural, and ordinary meaning, and, therefore, to prove the GEI defense, a defendant must show that their lack of capacity was a "consequence" or "effect" of their mental disease or defect. The defendant's mental disease or defect may combine with another condition to cause the lack of capacity, and the mental disease or defect need not be sufficient on its own to cause the lack of capacity. Because the Court of Appeals held otherwise, we reverse and remand.

## I.  BACKGROUND

This is the second time that this case is before this court. The historical facts of the case are recounted in the earlier decisions of both the Court of Appeals and this court. *State v. Meiser*, 308 Or App 570, 572-76, 481 P3d 375 (2021), *rev'd*, 369 Or 347, 506 P3d 402 (2022) *(Meiser I)*; *State v. Meiser*, 369 Or 347, 350-52, 506 P3d 402 (2022) *(Meiser II)*; *State v. Meiser*, 323 Or App 674, 676-77, 524 P3d 130 (2023) *(Meiser III)*. For the purposes of this decision, a summary of the trial and appellate proceedings is sufficient.

### A.  *Trial Court Proceedings*

Based on an incident in 2012, defendant was charged with multiple crimes, including several counts of

aggravated murder and burglary. The aggravated murder charges were based on the killing of one person, FH.

The trial court repeatedly found defendant unfit to stand trial by reason of incapacity. *See* ORS 161.360 (providing that a defendant may be found incapacitated if unable to understand the nature of the proceedings, to assist and cooperate with defense counsel, or to participate in the defense). Defendant spent nearly four years confined at the Oregon State Hospital before the trial court found him fit to stand trial.

Defendant waived his right to a jury, and the case proceeded to a bench trial. Defendant did not dispute that he had committed the charged acts, but he raised a GEI defense. As mentioned, the GEI defense is defined by ORS 161.295, which provides, in full:

> "(1)   A person is guilty except for insanity if, as a result of mental disease or defect at the time of engaging in criminal conduct, the person lacks substantial capacity either to appreciate the criminality of the conduct or to conform the conduct to the requirements of law.
>
> "(2)   As used in chapter 743, Oregon Laws 1971, the terms 'mental disease or defect' do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct, nor do they include any abnormality constituting solely a personality disorder."

ORS 161.295 (2011), *amended by* Or Laws 2017, ch 634, § 3.[1]

---

[1] Because the crimes charged in this case were committed in 2012, the 2011 version of ORS 161.295 applies. All references to the statute in this opinion are to the 2011 version.

In ORS 161.295(2), the reference to "chapter 743, Oregon Laws 1971," is to the Oregon Criminal Code of 1971, of which the GEI defense is a part. Or Laws 1971, ch 743, § 36.

In 2017, the legislature amended ORS 161.295 to replace the term "mental disease or defect" with the term "qualifying mental disorder," a term that the legislature thought had fewer negative connotations. Or Laws 2017, ch 634, § 3. In the preamble to the bill that made the change, the legislature explained that it did not intend to "mak[e] a substantive change" in the law and wanted to preserve "the validity of all previous court decisions interpreting" the prior wording. *Id.*, preamble. Although we are mindful of the negative connotations of the phrase "mental disease or defect," we use it in this opinion because it is the applicable statutory phrase.

The GEI defense is an affirmative defense. ORS 161.305. A defendant bears the burden of proving the elements of the defense by a preponderance of the evidence. ORS 161.055(2). As ORS 161.295(1) provides, to prove the GEI defense, a defendant must prove three elements:

(1) they suffered from a mental disease or defect

(2) that resulted in

(3) a lack of substantial capacity either (a) to appreciate the criminality of their conduct or (b) to conform their conduct to the requirements of the law.

In addition, as ORS 161.295(2) provides, a mental disease or defect does not include two types of abnormalities, specifically, (1) those manifested only by repeated criminal or antisocial conduct and (2) those constituting solely a personality disorder.

At trial, defendant called four mental health professionals to testify in support of his GEI defense. As we recounted in our prior decision, defendant

"offered the testimony of a psychologist and three psychiatrists, all of whom opined that defendant was suffering from schizophrenia but recognized that he had a co-occurring diagnosis of antisocial personality disorder. One of the psychiatrists explained that, as a symptom of defendant's schizophrenia, defendant experienced 'command auditory hallucinations'—voices that defendant believed to be telepathic communications from unseen entities—although defendant did not experience 'the kind of overwhelming command auditory hallucinations some other psychotic individuals have.'

"Two of the experts addressed the other elements of the GEI defense. Both testified that, at the time of the crimes, defendant lacked substantial capacity to conform his conduct to the requirements of the law. And both testified that, if not for the psychosis, defendant would not have committed the crimes. One of the experts specifically rejected the suggestion that defendant's 'conduct [was] a result of antisocial personality disorder rather than schizophrenia.' The other opined that both of defendant's conditions were 'active' at the time of the murder but that defendant's psychosis associated with his schizophrenia 'was more the predominant driver of his behaviors.'"

*Meiser II*, 369 Or at 351-52 (brackets in *Meiser II*). The state did not offer any contrary expert testimony; instead, it raised arguments about the applicable legal tests for the defense and the sufficiency of defendant's evidence.

Sitting as the factfinder, the trial court found that defendant had proved the GEI defense for some counts, but not for the aggravated murder counts or for one of the burglary counts. On the aggravated murder counts, the trial court found defendant guilty of murder as a lesser-included offense and merged the guilty verdicts into a single conviction. On the burglary count, the trial court found defendant guilty of second-degree burglary as charged.

The trial court did not address either the parties' disputes regarding what defendant was required to show to prove the elements of the GEI defense or their disputes regarding whether defendant's evidence was sufficient to prove those elements. Instead, the trial court stated its verdicts without elaboration, as a jury does in the absence of a special verdict form.

## B.   Meiser I

Defendant appealed, raising several assignments of error, including one asserting that the trial court had erred by rejecting his GEI defense to the murder charge.[2] Because the trial court had not expressed the basis for its rejection of the defense, defendant addressed all three elements of the defense. The first element—that defendant suffered from a qualifying mental disease or defect at the time of the murder, specifically, schizophrenia—was not disputed. The second and third elements—whether, as a result of his schizophrenia, defendant lacked the requisite capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law—were disputed. As to each of those elements, the parties disagreed about what a defendant must show to prove the element and whether defendant's evidence compelled a finding that he had made that showing.

---

[2] Defendant did not challenge the trial court's rejection of his GEI defense on the burglary charge.

Regarding the second element—that a defendant's lack of capacity must be "a result of" a mental disease or defect—defendant asserted that, as a legal matter, a defendant's lack of capacity is "a result of" a mental disease or defect if the mental disease or defect is a cause of the lack of capacity, even if it combines with other causes. Therefore, if his schizophrenia was a cause of his lack of capacity, he could establish the second element, even if his personality disorder was also a cause of his lack of capacity. The state, on the other hand, argued that a defendant's lack of capacity must be solely attributable to the defendant's mental disease or defect. So, the state urged, if defendant's schizophrenia combined with his personality disorder to cause his lack of capacity, defendant could not prove the second element. The Court of Appeals agreed with the state, ruling that, to prove the second element of the GEI defense, a defendant must show that their lack of capacity resulted solely from a mental disease or defect. *Meiser I*, 308 Or App at 582. Therefore, the court concluded, the GEI defense is not available to a defendant if the defendant's lack of capacity resulted from a combination of a mental disease or defect and a personality disorder. *Id*.

The Court of Appeals then applied its understanding of the GEI defense to the evidence in the case. *Id*. at 582-86. Because the GEI defense is an affirmative defense and the trial court had determined that defendant had failed to carry his burden in proving it, the question for the court was whether the evidence, viewed in the light most favorable to the state, compelled a conclusion that defendant had proved that his asserted lack of capacity at the time of the murder was solely attributable to his schizophrenia. *Id*. at 572, 582 (describing standard of review). The court summarized defendant's evidence and noted that he had presented expert testimony that his lack of capacity was caused by his schizophrenia. *Id*. at 585. But, based on the experts' testimony and defendant's statements about the crimes, the court concluded that a reasonable factfinder could find that any lack of capacity that defendant experienced was caused by a combination of his schizophrenia and his personality disorder. *Id*. That is, "the evidence permitted the factfinder to conclude, at the least, that defendant's schizophrenia and

antisocial personality disorder were both active impairments." *Id*. "Therefore, defendant did not establish, as a matter of law, the causation element of the GEI defense." *Id*. at 585-86.[3]

### C.   Meiser II

On defendant's petition, we allowed review of *Meiser I* to address the parties' disagreement about the elements of the GEI defense, specifically, their disagreement "about whether ORS 161.295 requires proof that defendant experienced the requisite incapacity *solely* 'as a result of' his schizophrenia, and not in any part as a result of his co-occurring antisocial personality disorder." *Meiser II*, 369

---

[3] The Court of Appeals noted, but did not resolve, the parties' disputes about the third element of the GEI defense, specifically, their disputes about (1) what a defendant must show to prove that they lacked the requisite capacity to appreciate the criminality of their conduct, and (2) whether the evidence compelled either a conclusion that defendant lacked the requisite capacity to appreciate the criminality of his conduct or a conclusion that he lacked the requisite capacity to conform his conduct to the requirements of law. *Id*. at 586-87 (noting the parties' dispute about whether a defendant's ability to "appreciate the criminality" of their conduct depends on a "subjective moral standard" and explaining that it did not need to resolve that dispute because "the trial court's rejection of the GEI defense is already justified by the facts that permit the trial court to have found that defendant's asserted incapacity, in whatever form, is not the result of a mental disease or defect"); *id*. at 587-88 (noting that it did not need to determine whether the evidence compelled a finding that defendant had been unable to conform his conduct to the requirements of law because "[t]he evidence permitted the trial court, sitting as factfinder, to reject the GEI defense" on the ground that defendant had failed to prove that any incapacity he experienced at the time of the murder was solely attributable to his schizophrenia).

In addition, the Court of Appeals rejected defendant's other assignments of error, including one asserting that the trial court had erred by declining to set out its conclusions of law regarding his GEI defense. *Id*. at 588-92. Defendant based that assignment of error on *State v. Colby*, 295 Or App 246, 433 P3d 447 (2018). In *Colby*, the Court of Appeals held that the trial court had erred when, during a bench trial in which the parties disputed the required elements of a crime, it declined the defendant's request that it identify its understanding of the elements. *Id*. at 251-53. Based on *Colby*, the *Meiser I* court noted that,

> "in a bench trial, 'there is no fixed procedural means of preserving a challenge to the trial court's determinations as to the elements of a crime, nor is the trial court required to express its ruling in a particular way.' Yet, a request may be appropriate, even if made unconventionally, as when pointing out in a bench trial a dispute that is reflected in conflicting jury instructions before the court."

308 Or App at 590 (quoting *Colby*, 295 Or App at 251 (internal citations omitted)). But the *Meiser I* court did not reach defendant's argument regarding the trial court's failure to set out its conclusions of law because defendant "did not adequately preserve [his] request for a ruling on a disputed point of law." *Id*.

Or at 349 (emphasis in original). Applying our methodology for statutory interpretation, we examined the text and legislative history of ORS 161.295. *Meiser II*, 369 Or at 355-61.

We began by looking at ORS 161.295(2), which establishes exclusions to the term "mental disease or defect." *Meiser II*, 369 Or at 356. Again, that subsection provides:

> "As used in chapter 743, Oregon Laws 1971, the terms 'mental disease or defect' do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct, nor do they include any abnormality constituting solely a personality disorder."

ORS 161.295(2). We explained that the exclusion of "'an abnormality manifested *only* by repeated criminal or otherwise antisocial conduct'" has been a part of ORS 161.295 since the statute's enactment as a section of the Oregon Criminal Code of 1971. *Meiser II*, 369 Or at 360 (quoting Or Laws 1971, ch 743, § 36 (emphasis in *Meiser II*)). We further explained that the exclusion was intended to prevent the GEI defense from being used by "a category of offenders whom the drafters did not view as possessing 'a mental disease or defect.'" *Meiser II*, 369 Or at 360. "[T]he category of concern was 'psychopaths' (or 'sociopaths')," and the legislature addressed that concern "by specifying that 'the terms 'mental disease or defect' do not include an abnormality manifested *only* by repeated criminal or otherwise antisocial conduct.'" *Id*. (quoting Or Laws 1971, ch 743, § 36 (emphasis in *Meiser II*)). The purpose of the exclusion was "to prevent 'recidivists' from 'qualify[ing] for the defense merely by being labeled psychopaths.'" *Meiser II*, 369 Or at 360 (quoting Commentary to Criminal Law Revision Commission Proposed Oregon Criminal Code, Final Draft and Report § 36, 35 (July 1970) (brackets in *Meiser II*)). Based on the text of the exclusion and its legislative history, we concluded that, although the legislature intended to preclude defendants from using the GEI defense based solely on having been labeled a psychopath or a sociopath, it did not intend to preclude defendants who suffered from both a mental disease or defect and another condition from using the defense. *Id.* We explained that,

"[b]y structuring the statute to exclude those who were 'merely' labeled as 'psychopaths,' (or those demonstrating 'an abnormality manifested *only* by repeated criminal or otherwise antisocial conduct,') the legislature left open the possibility that the defense could be available to offenders who suffered from 'a mental disease or defect' in addition to whatever label attached to their repeated criminal or antisocial conduct. And we understand the legislature to have intentionally struck that balance."

*Id*. (emphasis in original; internal citations omitted).

We also examined the other exclusion in ORS 161.295(2), that is, the exclusion of "any abnormality constituting solely a personality disorder." *Meiser II*, 369 Or at 358. We explained that the legislature added that exclusion in 1983, and the legislative history regarding the exclusion showed that the legislature intended to remove "the category of disorders characterized only as personality disorders from the larger group of 'mental disease or defect' that can be relied on for use of the insanity plea under ORS 161.295(1)." *Meiser II*, 369 Or at 358-59 (internal quotation marks omitted). We noted that the legislative history also showed that the legislature's choice to use the term "only" was intended "to indicate that a person who has 'a personality disorder plus a psychosis *** may still qualify'" for the defense. *Id*. at 357 (quoting Tape Recording, House Committee on Judiciary, HB 2075, May 13, 1983, Tape 324, Side A (statement of Jeffrey Rogers) (ellipses in *Meiser II*)). Based on its text and legislative history, we concluded that the exclusion

"specifies certain mental conditions that are not included within the broader terms 'mental disease or defect,' and in doing so, narrows access to the defense set out in subsection (1). But it does not make the defense so narrow as to require that a person who can demonstrate the requisite lack of substantial capacity 'as a result of mental disease or defect' also prove that a co-occurring personality disorder in no part contributed to the incapacity."

*Meiser II*, 369 Or at 360-61. Therefore, we concluded that the Court of Appeals had erred in holding that "defendant could prevail on his GEI defense only if he proved that his co-occurring personality disorder played *no* part in causing the requisite lack of substantial capacity." *Id*. at 361 (emphasis

in original). Because the Court of Appeals "did not consider—except under the 'sole cause' test * * *—whether the evidence compelled a finding that defendant proved that he had experienced any qualifying incapacity 'as a result of mental disease or defect,'" we remanded the case to the Court of Appeals. *Id*. We noted that, to determine whether defendant had proved the required connection, the Court of Appeals might have to determine whether the legislature intended to require that a mental disease or defect be "sufficient, on its own," to bring about the requisite lack of capacity, or whether it intended a "lesser degree of causal contribution." *Id*.[4]

D.   Meiser III

On remand, the Court of Appeals asked the parties to submit supplemental briefs regarding the nature of the required connection between a defendant's mental disease or defect and the requisite lack of capacity, and the parties did.

Based on the text and context of the phrase "as a result of," defendant argued that "result" should be given its plain, natural, and ordinary meaning, that is, "something that proceeds or arises as a consequence, effect, or conclusion of something else." Applying that meaning, defendant further argued that the evidence that he had presented compelled the conclusion that, at the time of the murder, he was incapacitated "as a consequence or effect proceeding or arising from his schizophrenia."

The state, on the other hand, argued that the phrase "as a result of" should be construed to impose a "standard of independent sufficiency." Therefore, the state argued, if a defendant raising a GEI defense has both a mental disease or defect and a personality disorder, the defendant must show that the mental disease or defect would have brought about the requisite lack of capacity on its own. Applying that standard, the state argued that defendant's evidence did not compel a conclusion that defendant's schizophrenia was sufficient, on its own, to bring about the requisite lack of capacity.

---

[4] We also noted that the issue of whether defendant's evidence compelled a conclusion that he had proved the third element of the defense—that he lacked the requisite capacity—was still an open one, because the Court of Appeals had not needed to address it in *Meiser I*. *Meiser II*, 369 Or at 361.

The Court of Appeals agreed with the state, ruling that, in order for a defendant to prove that their lack of capacity was "a result of" their mental disease or defect, the defendant must show that, "standing alone," the mental disease or defect "was sufficient, at the time of the criminal conduct, to bring about the incapacity." *Meiser III*, 323 Or App at 683; *see also id.* at 685 (the required causal connection is "one of independent sufficiency" (internal quotation marks omitted)).

Applying that standard, the Court of Appeals held that the record did not show that defendant had proved the causation element of his GEI defense as a matter of law. *Id.* at 686. That is, the record—viewed in the light most favorable to the state as it had to be, *see Meiser I*, 308 Or App at 572 (setting out standard of review)—did not compel a finding that, at the time of the murder, defendant's schizophrenia was sufficient, by itself, to bring about the requisite lack of capacity. *Meiser III*, 323 Or App at 686. The court acknowledged that both a psychologist, Beaver, and a psychiatrist, Choi, had testified that defendant "was experiencing command-auditory hallucinations, a hallmark of schizophrenia, on the day of the murder." *Id.* It also acknowledged that Beaver had testified that, at the time of the murder, defendant was "floridly psychotic" and would not have committed the crimes if not for his "active psychosis," and that Choi had testified that, during and after the murder, defendant was "highly psychotic," and without the psychosis "would not have committed the crimes." *Id.* at 687. The experts' testimony was corroborated by evidence that defendant "was suffering from hallucinations and delusions at the time of his crimes," including that

> "he had been 'deleted' from society; that he was being 'systematically persecuted by *** a large portion of American society,' as well as the police, who would only protect people of a certain class; that he needed a condo to get a 'toehold into society' as a property owner so that police would protect him and his family; that his daughter would be turned into a cannibal by the voices he heard; and that his son was being poisoned and would also be harmed by the entities represented by the voices."

*Id*. at 687 (ellipses in original). The Court of Appeals concluded that the evidence "would certainly *permit* a finding" that "defendant's asserted lack of substantial capacity ∗ ∗ ∗ was 'the result of' his schizophrenia under [an] independent sufficiency measure." *Id*. at 688 (emphasis in original). But the court went on to say that that was "not the only finding that could reasonably be derived from [the] record." *Id*. Pointing to Choi's testimony that defendant's schizophrenia and personality disorder "both were active" and defendant's statement that he had "lashed out" in anger when he killed FH, the court concluded that a factfinder could find that defendant's schizophrenia was not sufficient, on its own, to bring about his lack of capacity:

> "[E]ven accepting Choi's opinion that defendant's schizophrenia 'played a major role in' and 'was more the predominant driver of' defendant's criminal conduct in killing FH—and that, if not for that psychosis, defendant would not have committed the act—a reasonable trier of fact would not be required to find that defendant's schizophrenia was *sufficient*—independent of his antisocial personality disorder—to bring about his lack of substantial capacity at the time of the act."

*Id*. at 689-90 (emphasis in original). Consequently, the Court of Appeals affirmed the trial court's judgment. *Id*. at 690.

On defendant's petition, we allowed review to determine the connection that a defendant must establish between their mental disease or defect and their lack of capacity in order to prove the GEI defense.

## II.   ANALYSIS

The issue on review presents a question of statutory interpretation, to which we apply the methodology set out in *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009). Our goal is to ascertain the intent of the legislature that enacted the provision at issue. *SAIF v. Ward*, 369 Or 384, 394, 506 P3d 386 (2022). To do so, we look first to the text of the provision, in context, which is the best evidence of the legislature's intent. *Gaines*, 346 Or at 171. We may then look to the legislative history of the provision, giving it the weight we deem appropriate. *Id*. at 172.

A.  *Text*

We begin with the text of ORS 161.295, which we set out again:

> "(1)  A person is guilty except for insanity if, as a result of mental disease or defect at the time of engaging in criminal conduct, the person lacks substantial capacity either to appreciate the criminality of the conduct or to conform the conduct to the requirements of law.

> "(2)  As used in chapter 743, Oregon Laws 1971, the terms 'mental disease or defect' do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct, nor do they include any abnormality constituting solely a personality disorder."

As discussed, to prove the GEI defense, a defendant must show that, "as a result of" a mental disease or defect, they lacked the substantial capacity to appreciate the criminality of their conduct or to conform their conduct to the requirements of the law. Thus, the defendant must show a connection between their mental disease or defect and their lack of capacity. The key term in the legislature's expression of the required connection is "result." The legislature did not define that term, and it is a term of common usage. "When the legislature has not specially defined a term of common usage, we generally assume that the legislature intended to use the term in a manner consistent with its 'plain, natural, and ordinary meaning,' and we often consult dictionaries for guidance in determining what the legislature would have understood a term to mean." *Kinzua Resources v. DEQ*, 366 Or 674, 681, 468 P3d 410 (2020).

The term "result," when used as a noun, as it is in ORS 161.295(1), is defined as "something that results as a consequence, effect, issue, or conclusion." *Webster's Third New Int'l Dictionary* 1937 (unabridged ed 2002). That definition uses the verb form of "result," which means "to proceed, spring, or arise as a consequence, effect, or conclusion." *Id*. Neither definition indicates that a "result" must be attributable to a single cause or an independently sufficient cause.

The definitions of "result" as a noun and a verb use several terms, and, of those terms, "consequence" and "effect" fit best in the context of the GEI defense. *See Jenkins v. Board of Parole*, 356 Or 186, 194, 335 P3d 828 (2014) (relying on context to determine which, among multiple dictionary definitions, the legislature intended); *State v. Fries*, 344 Or 541, 546, 185 P3d 453 (2008) (same). Although it is possible to say that a person's lack of capacity "issued from" or was "a conclusion of" their mental disease or defect, it is more natural to say that their lack of capacity was "a consequence of" or an "effect of" their mental disease or defect.

The definitions of "consequence" and "effect" support the view that a "result" may have multiple causes. The term "consequence" is defined as "something that is produced by a cause or follows from a form of necessary connection or from a set of conditions," as in the phrase "this refined taste is the [result] of education and habit." *Webster's* at 482. Similarly, the term "effect" is defined as "something that is produced by an agent or cause : something that follows immediately from an antecedent : a resultant condition," as in the example "low mortality, the [result] of excellent social services available in every village." *Id.* at 724. Thus, the fact that "result" is defined as a "consequence" or "effect" indicates that a "result" may flow from "a set of conditions." *Id.* at 482.

To summarize, the legislature's use of the term "result"—a term of common usage—indicates that the GEI defense applies if a defendant proves that they lacked the requisite capacity as a "consequence" or "effect" of their mental disease or defect. *Id.* at 1937. It further indicates that the lack of capacity need not be solely attributable to the mental disease or defect; a "set of conditions" can combine to result in the lack of capacity. *Id.* at 482.[5]

---

[5] Because "result" is a word of common usage and there is no indication that the legislature intended it to have a specialized meaning, we look to its common meaning. But, even if we were to assume that the legislature intended "result" to have a legal meaning, the meaning would be the same, because the common meaning of the term, as set out in *Webster's*, tracks the legal meaning, as set out in *Black's Law Dictionary*. When the Oregon Criminal Code was enacted, *Black's* defined the noun "result" to mean "[t]hat which results, the conclusion or end to which any course or condition of thing leads, or which is obtained by any process or operation; consequence or effect." *Black's Law Dictionary* 1478 (rev 4th ed 1968). Similarly, it defined the verb version of "result" as "[t]o proceed, to spring, or arise, as a consequence, effect, or conclusion * * *." *Id.*

### B.  *Context*

Those indications are supported by the immediate context of the phrase "as a result of." Notably, the legislature did not modify "result." ORS 161.295(1) simply provides that "[a] person is guilty except for insanity if, as a result of mental disease or defect at the time of engaging in criminal conduct," the person lacked the requisite capacity. The statute does not say, for example, that "a person is guilty except for insanity if, *solely* as a result of mental disease or defect ***." Nor does it say that "a person is guilty except for insanity if, *primarily* as a result of mental disease or defect ***." Nothing in the text of ORS 161.295(1) suggests that a defendant's lack of capacity can be "a result of" the defendant's mental disease or defect only if the mental disease or defect rises to a certain degree or amount or accounts for a certain portion of the defendant's lack of capacity. The provision does not require, for example, that a defendant's mental disease or defect must be a major cause or an independently sufficient cause of the defendant's lack of capacity.

The fact that, in ORS 161.295(1), the legislature did not modify "result" with a quantitative descriptor is significant on its own. But its significance is heightened because another subsection of the same statute, ORS 161.295(2), shows that, when the legislature first enacted the GEI statute in 1971 and when it later amended it in 1983, it was aware that a person's mental condition can result from a combination of causes. *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-11, 859 P2d 1143 (1993) (a statutory term's context includes other sections of the same statute).

As we explained in *Meiser II*, when ORS 161.295 was originally enacted in 1971, subsection (2) of the statute limited the definition of "mental disease or defect" by providing that "the terms 'mental disease or defect' do not include an abnormality manifested *only* by repeated criminal or otherwise antisocial conduct." Or Laws 1971, ch 743, § 36 (emphasis added). The purpose of that exclusion was "to prevent 'recidivists' from 'qualify[ing] for the defense *merely* by being labeled psychopaths.'" *Meiser II*, 369 Or at 360 (quoting Commentary § 36 at 35 (brackets in *Meiser II*; emphasis added)). In 1983, the legislature amended ORS

161.295(2) to add an exclusion for "any abnormality constituting *solely* a personality disorder." Or Laws 1983, ch 800, § 1 (emphasis added). The exclusions in ORS 161.295(2) show that, in both 1971 and 1983, the legislature was alert to the fact that an "abnormality" can result from a combination of conditions. They also show that the legislature intended to prevent abnormalities resulting "only" or "solely" from certain conditions—specifically, psychopathy and personality disorders—from being the basis for a GEI defense. They do not, however, show that the legislature intended to prevent abnormalities resulting from a combination of conditions from being the basis of a GEI defense. If the legislature had intended to limit the availability of the GEI defense to situations where a defendant's lack of capacity was "only" or "solely" the result of the defendant's mental disease or defect, it could have. Likewise, if it had wanted to limit the availability of the defense to situations where the defendant's lack of capacity was an "independent" result of the defendant's mental disease or defect, it could have.

The broader context of ORS 161.295 further indicates that "result" should be given its plain, natural, and ordinary meaning and that a "result" may flow from a combination of conditions. As mentioned, ORS 161.295 was enacted as part of the Oregon Criminal Code. Or Laws 1971, ch 743, § 36. As we will explain, this court has already construed similar causation requirements in other statutes enacted as part of the code and held both that the term "cause" should be given its plain, natural, and ordinary meaning and that, in situations where multiple acts combine to bring about a result, each act is a "cause." We did so first in *State v. Murray*, 343 Or 48, 162 P3d 255 (2007), and then in *State v. Turnidge (S059155)*, 359 Or 364, 374 P3d 853 (2016).

In *Murray*, we construed ORS 163.165, which provides that a person commits third-degree assault if the person "[r]ecklessly *causes* serious physical injury to another by means of a deadly or dangerous weapon." (Emphasis added.) The parties disputed the meaning of "cause." *Murray*, 343 Or at 51. We noted that the legislature had not defined the

term and that it was a term of common usage, and we looked to the term's dictionary definition:

> "The word 'cause' is not defined in the criminal statutes. It is, however, a word of common usage, which we presume the legislature intended to be given its plain, natural, and ordinary meaning. The dictionary defines the verb 'cause' as follows: '1: to serve as a cause or occasion of : bring into existence: MAKE (careless driving *** accidents) *** 2: to effect by command, authority or force.' *Webster's* [at 356]."

*Id.* at 52 (first citation omitted; second ellipses in *Murray*). Accordingly, we ruled that a person "causes" serious physical injury to another if the person "brings about, makes, or effects by force the serious injury of another person." *Id.*

We applied that rule to the facts of the case. In *Murray,* the defendant had been charged with third-degree assault for injuring the victim in a car crash. *Id.* at 51. The defendant owned an automobile shop that converted conventional cars into race cars, and the victim was his employee. *Id.* at 50. The car crash occurred while the defendant was test driving a race car and the victim was voluntarily riding with him. *Id.* At trial, the defendant moved for a judgment of acquittal on the third-degree assault charge, asserting that he was not criminally responsible for the victim's injuries because the victim was a voluntary participant in the reckless activity that led to his injuries. *Id.* at 51. This court rejected that argument, ruling that a person commits third-degree assault if the person recklessly causes serious physical injury to another person, "no matter the role of the other person in the reckless conduct." *Id.* at 52.

This court followed *Murray* in *Turnidge*. In that case, we construed the criminal homicide statute, ORS 163.005(1), which applies when a person "causes the death of another." We reviewed the text, context, and legislative history of the homicide statute, and we concluded that the term "cause" should be given its plain, natural, and ordinary meaning. *Turnidge*, 359 Or at 483. As in *Murray*, we derived that meaning from the term's dictionary definition. *Id.* at 474-77. We then applied that meaning to the facts of the case and again concluded that a result may follow from a combination of conditions. *Id.* at 483.

In *Turnidge*, the defendant was charged with multiple crimes, including aggravated murder, attempted aggravated murder, and assault. *Id.* at 380. The charges were based on an incident during which a bomb was found outside a bank and then brought inside the bank, where it exploded when law enforcement officers attempted to disarm it. *Id.* at 367-69. The explosion killed two persons and injured two others. *Id.* at 369. The state's theory was that the defendant had helped build and place the bomb. *Id.* at 481-82. The state did not contend that the defendant had detonated the bomb; its evidence suggested that the bomb was detonated as a result of how it was handled after it was found or as a result of a stray radio signal. *Id.* at 458-59. The defendant moved for a judgment of acquittal on the ground that the state's evidence was insufficient to prove that he had caused the deaths and injuries. *Id.* at 454-55. On review, we rejected that argument, holding that the state's evidence of the defendant's conduct provided an ample basis for the jury to find that he had caused the deaths and injuries, and we noted that the defendant's role "did not have to be the last link in the chain, or the only one, for the jury to make that determination." *Id.* at 482. Later, when discussing jury instructions on causation, we stated that "a defendant's conduct 'causes' a result if it brings about, makes, or effects by force that result, 'no matter the role' of another person and regardless of [the] other person's reckless participation." *Id.* at 483 (quoting *Murray*, 343 Or at 52); *see also id.* (explaining that, for the purposes of the criminal statutes at issue, causation does not "depend on a comparison of a defendant's causal role with that of the victim or some third party").

To summarize, the context of the phrase "as a result of" in ORS 161.295(1) indicates that "result" should be given its plain, natural, and ordinary meaning. It shows that the legislature was alert to the fact that conditions can combine to cause a lack of capacity and that it knew how to use quantitative descriptors to address situations involving a single condition. The fact that the drafters did not use a quantitative descriptor to modify "result" indicates that the legislature did not intend to impose a quantitative requirement on the connection between a defendant's mental disease or defect and their lack of capacity. In addition, the GEI

defense is part of the Oregon Criminal Code, and *Murray* and *Turnidge* show that, when construing statutes in the code, this court has given a similar term, "cause," its plain, natural, and ordinary meaning. *Murray* and *Turnidge* also illustrate that multiple factors may combine to bring about a result, and, if they do, each of the factors is a "cause." *Murray*, 343 Or at 52; *Turnidge*, 359 Or at 482-83. And they illustrate that whether a factor is a "cause" does not depend on its relative contribution to bringing about the result. *Murray*, 343 Or at 52; *Turnidge*, 359 Or at 483.

C.  *Legislative History*

The legislative history does not indicate otherwise. The commentary to the final draft of the Oregon Criminal Code states that section 36 of the final draft, which became ORS 161.295, was based on section 4.01 of the Model Penal Code (MPC). Commentary § 36 at 34. The parties have not identified, and we have not found, anything in the legislative history of either the Oregon Criminal Code or the MPC that indicates that the drafters of either code intended "result" to have anything but its plain, natural, and ordinary meaning. They have not identified, and we have not found, any discussions of the nature of the connection that must exist between a defendant's mental disease or defect and their lack of capacity in order for the GEI defense to apply. Nothing in the legislative history indicates that the legislature intended to make the GEI defense available only if a defendant's mental disease or defect rose to a certain degree or amount or accounted for a certain portion of their lack of capacity. In other words, nothing in the legislative history indicates that the legislature intended to attach a quantitative requirement to the connection between a defendant's mental disease or defect and their lack of capacity. If we were to attach one, we would be adding words to the statute and wholly speculating about what the degree, amount, or portion should be.

It is true, of course, in both 1971 and 1983, the legislature intended to put some limits on the GEI defense. They did so through ORS 161.295(2), which narrows the definition of "mental disease or defect." But, as we explained in *Meiser II*, the legislative history from 1971 shows that

the legislature did not intend to preclude defendants who suffered from both a mental disease or defect and another condition from being able to use the defense. *Meiser II*, 369 Or at 360. As we further explained, the 1983 legislature "intended to retain that balanced approach when it amended subsection (2) to also exclude 'personality disorders' from the definition of 'mental disease or defect.'" *Id*. That additional exclusion narrowed the availability of the GEI defense, but it did not make the defense "so narrow as to require that a person who can demonstrate the requisite lack of substantial capacity 'as a result of mental disease or defect' also prove that a co-occurring personality disorder in no part contributed to the incapacity." *Id*. at 360-61.

Just as we have not found anything in the legislative history of ORS 161.295 to indicate that the legislature intended a defendant's mental disease or defect to be the sole cause of their lack of capacity, we have not found anything in the legislative history to indicate that the legislature intended a defendant's mental disease or defect to be an independently sufficient cause of their lack of capacity. Thus, nothing in the legislative history leads to a conclusion other than the one that follows from the plain text and context of ORS 161.295. To the contrary, the legislative history reinforces the idea that, in both 1971 and 1983, the legislature was aware that conditions can combine to result in a lack of capacity and that, contrary to the Court of Appeals' conclusion in *Meiser III*, it did not intend to limit the availability of the GEI defense to situations where a defendant's mental disease or defect, "standing alone," was sufficient to bring about the requisite lack of capacity.

D.   *Summary and Conclusion*

As we have explained, the plain text of ORS 161.295(1) states that a person is "guilty except for insanity" if, "as a result of" their mental disease or defect, the person "lacks substantial capacity either to appreciate the criminality of the conduct or to conform the conduct to the requirements of law." To determine the meaning of "as a result of," we have applied our established method of statutory interpretation and examined the text, context, and legislative history of ORS 161.295(1). *Gaines*, 346 Or at 171-72.

Each of those indicators of legislative intent support giving "result" its plain, natural, and ordinary meaning: "consequence" or "effect."

First, the text. The legislature did not define "result," and it is a term of common usage that means, as relevant here, "consequence" or "effect." *Webster's* at 1937. And a "consequence" or "effect" may flow from a "set of conditions." *Id.* at 482.

Multiple aspects of the context of ORS 161.295(1) support giving "result" its plain, natural, and ordinary meaning. The legislature did not modify the term "result" in ORS 161.295(1); it did not include any quantitative limitations on the term. The legislature's failure to do so is significant on its own, but its significance is heightened because the legislature used such limitations—specifically, "only" and "solely"—in ORS 161.295(2). Altogether, ORS 161.295 shows that the legislature intended the GEI defense to be available if a defendant's lack of capacity was a consequence or effect of the defendant's mental disease or defect, even if it was also the consequence or effect of another condition. In addition, giving "result" its plain, natural, and ordinary meaning and recognizing that a result may flow from a combination of conditions is consistent with what this court did in *Murray* and *Turnidge* when construing a similar term in criminal statutes that were also enacted as part of the Oregon Criminal Code. In those cases, this court used the dictionary definition of "cause" and held that multiple factors may combine to bring about a result, and that each is a "cause," regardless of the relative contribution of each factor. *Murray*, 343 Or at 52; *Turnidge*, 359 Or at 482-83.

The legislative history is consistent with the text and context. It indicates that the legislature intended to impose some limits on the availability of the GEI defense but that it did not intend to impose a quantitative requirement on the connection between a defendant's mental disease or defect and their lack of capacity.

Consequently, we reject the Court of Appeals' conclusion that a defendant's mental disease or defect must be "sufficient by itself" to bring about the requisite lack of capacity.

## E.  *Response to Justice Bushong's Concurrence*

We now address Justice Bushong's concurrence, in which he argues that (1) we could have resolved the meaning of "as a result of" in *Meiser II*; (2) our conclusion that "result" should be given its plain, natural, and ordinary meaning fails to provide sufficient guidance to mental health experts and trial courts; and (3) we should interpret "as a result of" to require application of a "substantial factor" causation standard he draws from civil negligence cases decided in the 1960s and 1970s. ___ Or at ___, ___, ___ (Bushong, J., concurring) (slip op at 4:8 - 5:5, 6:6 - 7:2, 12:13 - 13:7).[6] As we will explain, (1) in *Meiser II*, we did not address the issue that we resolve in this opinion because the Court of Appeals had not addressed it and the parties had not briefed it; (2) giving "result" its plain, natural, and ordinary meaning is not confusing and is consistent with what we have done when construing required causal connections in other criminal cases; and (3) we should not import the concurrence's "substantial factor" causation standard because (a) this court has already stated that civil negligence standards of causation are an "uneasy fit in the criminal law context," *Turnidge*, 359 Or at 472 n 62; (b) the concurrence's assertion that, when the legislature adopted the Oregon Criminal Code, it intended to import a "substantial factor" causation standard from civil negligence law and reject a "but for" causation standard is not supported by the legislative history that the concurrence relies on; and (c) the concurrence's "substantial factor" causation standard (i) would cause uncertainty and confusion because the term "substantial factor" is not defined and has been understood in different ways, at different times and in different contexts, and (ii) could be misleading because it could suggest a quantitative requirement or a comparison of the relative contributions of different factors, which—as the

---

[6] We note that no party has advocated for use of a "substantial factor" test in this case. The state has argued for an "independently sufficient" test: "[T]o qualify for the GEI defense, a defendant must prove that his mental disease or defect was independently sufficient to bring about the requisite lack of substantial capacity." Defendant has argued that we give "result" its dictionary definition: Based on the "plain-meaning/ordinary-usage definition of 'result,'" the legislature "intended merely that the substantial incapacity be a consequence, effect, issue, or conclusion proceeding or arising from mental disease or defect."

text, context, and legislative history just discussed show—the legislature did not intend.

1.  *The* Meiser II *remand was appropriate.*

The concurrence appears to argue that we should have resolved the meaning of "result" in *Meiser II*. ___ Or at ___ (Bushong, J., concurring) (slip op at 4:8 - 5:5). We disagree. In *Meiser II*, the issue on review was whether the Court of Appeals had erred in ruling that the GEI defense is not available if a defendant's lack of capacity resulted from both a mental disease or defect and a personality disorder. *Meiser II*, 369 Or at 349-50 (identifying issue on review); *id*. at 361 (same). Accordingly, the parties' briefs focused on whether the legislature intended to allow "combined causation" at all. They did not address whether, if the legislature intended to allow "combined causation," it also intended to require a certain degree of causal contribution from a defendant's mental disease or defect. We resolved the issue presented by the Court of Appeals opinion and the parties' briefing, holding that the Court of Appeals had "erred in concluding that defendant could prevail on his GEI defense only if he proved that his co-occurring personality disorder played *no* part in causing the requisite lack of substantial capacity." *Meiser II*, 369 Or at 361 (emphasis in original).

We then explained that "[t]hat conclusion answers the question that this court allowed review to address, but it does not fully resolve whether defendant was entitled to prevail on his GEI defense." *Id*. That was, in part, because the Court of Appeals had not considered—"except under the 'sole cause' test" that we rejected—"whether the evidence compelled a finding that defendant proved that he had experienced any qualifying incapacity 'as a result of mental disease or defect.'" *Id*. We observed that,

> "[a]s the state emphasizes, any answer to [that] question may turn on whether the phrase 'as a result of' in ORS 161.295(1) means that the qualifying 'mental disease or defect' must be sufficient, on its own, to bring about the requisite incapacity, or whether the legislature intended to require some lesser degree of causal contribution from the qualifying 'mental disease or defect.'"

*Id.* We also observed that defendant had not argued for a specific standard of causation and that the *amicus curiae* had argued for a "but for" standard of causation, that is, "but for" the mental disease or defect the incapacity would not have occurred. *Id.* at 361 n 10. We took no position on the issue, and we remanded the case to the Court of Appeals, so that the parties and the Court of Appeals could address it, *id.* at 361-62, which they did.

On remand, the parties submitted supplemental briefing. Based on that briefing, the Court of Appeals issued *Meiser III*, in which it ruled that, in order to prove the GEI defense, a defendant must show that their mental disease or defect was an independently sufficient cause of their lack of capacity. 323 Or App at 683. We allowed review to address that new ruling, and we have done so in this opinion.

The concurrence comments that, "if the dictionary definition alone is sufficient," we could have just said so in *Meiser II*. ___ Or at ___ (Bushong, J., concurring) (slip op at 4:18 - 5:2). To the extent that that comment is critical of our reliance on the dictionary definition, we note that, when construing a statutory term of common usage, "we generally assume that the legislature intended to use the term in a manner consistent with its 'plain, natural, and ordinary meaning,' and we often consult dictionaries for guidance in determining what the legislature would have understood a term to mean." *Kinzua Resources*, 366 Or at 681. Of course, "[i]n construing statutes, we do not simply consult dictionaries and interpret words in a vacuum. Dictionaries, after all, do not tell us what words mean, only what words *can* mean, depending on their context and the particular manner in which they are used." *State v. Cloutier*, 351 Or 68, 96, 261 P3d 1234 (2011) (emphasis in original). Accordingly, we apply our method of statutory construction and look beyond the text at issue to its context and legislative history. *Id.* at 96, 101; *Gaines*, 346 Or at 171-72. We have done that here, and our conclusion regarding the meaning of "result" is supported by those sources.

The concurrence asserts that, in *Meiser II*, we implicitly suggested that "result" should not be given its dictionary definition. ___ Or at ___ (Bushong, J., concurring)

(slip op at 5:6-8). We disagree with that reading. Nothing in *Meiser II* was intended to prejudge issues that the parties and the Court of Appeals had not yet addressed.

The concurrence points out that, in *Meiser II*, we quoted the definition of "result." ___ Or at ___ (Bushong, J., concurring) (slip op at 5:2-5). That is true. We did so in the context of explaining that the definition of "result" did not support the Court of Appeals' conclusion that a defendant's mental disease or defect had to be the sole cause of the defendant's lack of capacity. We stated:

> "In ordinary usage, the term 'result' is not limited to the concept of sole causation. *See Webster's* at 1937 (defining noun 'result,' most pertinently, as 'something that results as a consequence, effect, issue, or conclusion')."

*Meiser II*, 369 Or at 359-60. That was the full extent of our reference to the dictionary definition of "result." We used the definition in our analysis of the statutory construction issue presented in *Meiser II*. We were not addressing any other statutory construction issue. In fact, we explicitly stated that, although, as a matter of judicial efficiency, "this court sometimes resolves issues beyond those as to which we allowed review, rather than remanding to the Court of Appeals to resolve remaining issues," we were declining to do so because "the remaining statutory construction issue would benefit from consideration in the first instance by the Court of Appeals." *Id*. at 361-62. Thus, contrary to the concurrence's assertion, our reference to the dictionary definition of "result" was not an implicit suggestion that the term should not be given its plain, natural, and ordinary meaning. We used that meaning in our *Gaines* analysis of the question presented then, just as we have used it in our *Gaines* analysis of the question presented now.

> 2.  *The plain meaning of "result" is clear and using it is consistent with case law.*

The concurrence's second argument is that our opinion does not clearly identify the test that the legislature intended and does not provide adequate guidance to mental health experts and trial courts. ___ Or at ___ (Bushong, J., concurring) (slip op at 6:6 - 7:2). We disagree. We are giving

the term "result" its plain, natural, and ordinary meaning, taken from its dictionary definition. We do not think that that meaning is unclear. It is straightforward, and fact-finders—whether judges or juries—will be able to apply it. Moreover, using the dictionary definition is consistent with our case law. As recounted above, ___ Or at ___ (slip op at 19:2 - 21:19), we did the same thing with "cause" in both *Murray* and *Turnidge*. *Murray*, 343 Or at 52 (applying dictionary definition of "cause"); *Turnidge*, 359 Or at 482-83 (same).

3.   *It is not appropriate to import the concurrence's "sub-stantial factor" causation standard into the GEI statute.*

Instead of giving "result" its plain, natural, and ordinary meaning, the concurrence would hold that, to determine whether a defendant's lack of capacity was "a result of" their mental disease or defect, a court must apply a "substantial factor" test for causation. ___ Or at ___ (Bushong, J., concurring) (slip op at 3:5-8). More specifically, it appears that the concurrence would hold that a court must apply the "substantial factor" test used in civil tort cases decided in the 1960s and 1970s. ___ Or at ___ (Bushong, J., concurring) (slip op at 12:13 - 13:7). We do not believe it is appropriate to import the concurrence's "substantial factor" causation standard into the GEI statute for three reasons.

a.   This court has cautioned against importing civil law tort principles into criminal law.

First, in *Turnidge*, we cautioned against importing civil law tort principles into criminal law. 359 Or at 472 n 62. We noted that "long-standing observations" by scholars "point out that civil law tort principles of causation are an uneasy fit in the criminal law context," both because tort and criminal law involve different policy objectives and because tort law issues are generally governed by common law, while criminal law issues are generally governed by statute. *Id.* Those observations predate the legislature's enactment of the Oregon Criminal Code. *See id.* (citing Paul K. Ryu, *Causation in Criminal Law*, 106 U Pa L Rev 773, 773, 803 (1958) for the proposition that "causation has received 'scant

attention' in area of criminal law, as opposed to civil tort law; in criminal law field, courts have not applied a uniform law of causation, and principles should not necessarily track civil law principles, because the policy objectives of tort and criminal law are not the same").

   b.   The concurrence's "substantial factor" test is not supported by legislative history.

Second, the legislative history of ORS 161.295 does not support the concurrence's claim that the legislature intended to adopt a "substantial factor" causation standard. As noted, nothing in the legislative history of either the Oregon Criminal Code or the MPC indicates the nature of the connection that must exist between a defendant's mental disease or defect and their lack of capacity. And, the term "substantial factor" does not appear anywhere in the legislative history of the GEI provision to the Oregon Criminal Code. In fact, the term does not appear anywhere in the commentary to the Oregon Criminal Code. Nothing in the legislative history of the GEI statute indicates that the legislature intended to import a "substantial factor" causation standard from civil negligence law into the GEI statute.

To support its position, the concurrence relies on the fact that the drafters of both the MPC and the Oregon Criminal Code disfavored the rule regarding insanity set out in *Durham v. United States*, 214 F2d 862, 874-75 (DC Cir 1954), *abrogated by United States v. Brawner*, 471 F2d 969 (DC Cir 1972). But, as we will explain, *Durham* did not concern the standard of causation.

As we have explained, the GEI statute was based on section 4.01 of the MPC. Commentary § 36 at 34. The commentary to that section of the Oregon Criminal Code explains that both the MPC and Oregon drafters declined to adopt the *Durham* rule.

The *Durham* rule was that "an accused is not criminally responsible if his *unlawful act* was the product of mental disease or defect." *Durham*, 214 F2d at 874-75 (emphasis added). Thus, under the *Durham* rule, whether a defendant was criminally responsible turned on whether their mental disease or defect caused their *conduct*, not whether it caused

*a lack of capacity*. That was a problem because, under the rule, a defendant was not criminally responsible if their conduct was a product of their mental disease or defect, regardless of whether they had the capacity to appreciate the criminality of their conduct or conform their conduct to the requirements of the law.

To illustrate the problem, the MPC drafters provided a hypothetical: a situation where a person murders a wealthy relative because, as a result of a mental disease or defect, the person believes that they will inherit a large amount of money. Model Penal Code § 4.01 comment 3 at 173 n 24 (Official Draft and Revised Comments 1985). Under the *Durham* rule, the person could raise a defense based on their mental disease or defect because there would be a causal connection between the mental disease or defect and their criminal conduct, even if they had been fully capable of understanding the criminal nature of their conduct and conforming their conduct to the requirements of the law. The MPC and Oregon drafters rejected the *Durham* rule because of that problem. Model Penal Code § 4.01 comment 5 at 159 (Tentative Draft No. 4 1955); Commentary § 36 at 35-36. They wanted to make sure that there was a causal connection between a person's mental disease or defect and the requisite lack of capacity, and they did that by providing that a person is GEI when, as a result of a mental disease or defect, the person lacks the requisite capacity. Model Penal Code § 4.01(1) (Proposed Official Draft 1962); ORS 161.295(1). Thus, the drafters' rejection of the *Durham* rule says nothing about the requisite standard of causation. The rule did not set out any standard of causation, and the drafters' rejection of it does not provide any support for the concurrence's conclusion that the drafters intended to adopt a "substantial factor" causation standard.

The concurrence also mentions *United States v. Currens*, 290 F2d 751, 774 (3rd Cir 1961), to which the Oregon drafters referred. ___ Or at ___ n 13, ___, ___ n 16 (Bushong, J., concurring) (slip op at 19:5 n 13, 21:7, 21:7 n 16). In *Currens*, the court stated that "[t]he jury must be satisfied that at the time of committing the prohibited act the defendant, as a result of mental disease or defect, lacked

substantial capacity to conform his conduct to the requirements of the law which he is alleged to have violated." 290 F2d at 774. That rule is essentially the same as the rule in ORS 161.295. It simply provides that the defendant's lack of capacity must result from the defendant's mental disease or defect. And, like ORS 161.295, it does not specify an amount of causation. It does not say, for example, that the lack of capacity must result solely from, primarily from, or substantially from the mental disease or defect.

The *Currens* court explained that its rule allows for consideration of the "total mental condition." 290 F2d at 774. That supports our interpretation of "result" as meaning a "consequence" or "effect." Giving "result" its plain, natural, and ordinary meaning allows for consideration of a defendant's "total mental condition," because, as discussed above, a "result" may flow from "a set of conditions." *Webster's* at 482. Therefore, a defendant raising a GEI defense can show the required connection between their mental disease or defect and their lack of capacity by showing that their mental disease or defect was a condition that contributed to their lack of the requisite capacity.

> c. The concurrence's test is unclear, would cause uncertainty and confusion, and could be misleading.

Third, although the concurrence asserts that using the "substantial factor" causation standard would provide clarity, ___ Or at ___, ___, ___ (Bushong, J., concurring) (slip op at 1:18-19, 7:3-6, 17:2-9), it is difficult to see how that would be the case because the concurrence does not define "substantial factor" causation. This court had not defined the term before 1971, nor had *Black's Law Dictionary*. In fact, this court has still not defined the term. The concurrence notes that the term has been used in civil negligence cases and employment discrimination cases. ___ Or at ___ (Bushong, J., concurring) (slip op at 9:1 - 12:2). In both of those contexts, the commentaries to the uniform jury instructions relating to the term state that this court has not defined "substantial factor." The comment to the Uniform Civil Jury Instruction on substantial factor causation in the negligence context, UCJI 23.02, states that "the UCJI Committee could

find no Oregon case defining *substantial factor* in this context." Comment to UCJI 23.02, Oregon State Bar Committee on Uniform Civil Jury Instructions (Dec 2014) (emphasis in original). Likewise, the comment to the "substantial factor" instruction in the employment discrimination context, UCJI 59A.03, states that "[t]he Oregon Supreme Court has established the 'substantial factor' standard but has not defined precisely what *substantial factor* means." Comment to UCJI 59A.03, Oregon State Bar Committee on Uniform Civil Jury Instructions (Dec 2011) (emphasis in original).

Not only is the term "substantial factor" undefined, it also has been used in different ways at different times and in different contexts. *See Burrage v. United States*, 571 US 204, 217, 134 S Ct 881, 187 L Ed 2d 715 (2014) ("The judicial authorities invoking a 'substantial' or 'contributing' factor test in criminal cases differ widely in their application of it."); *see also Restatement (Third) of Torts* § 26 comment j (2010) ("The 'substantial factor' rubric is employed alternately to impose a more rigorous standard for factual cause or to provide a more lenient standard.").

The concurrence relies heavily on civil negligence cases from the 1960s and 1970s. ___ Or at ___ (Bushong, J., concurring) (slip op at 9:1 - 10:13). It asserts that "a substantial factor test was widely used" in those cases, and it further asserts that the legislature intended to import that causation standard into the GEI statute when it enacted the Oregon Criminal Code in 1971. ___ Or at ___, ___ (Bushong, J., concurring) (slip op at 12:13 - 13:1, 18:3 - 21:13). But, as discussed above, nothing in the legislative history indicates that the legislature intended to do so. And there is reason to believe that they did not, given that they were creating a statutory code, as opposed to relying on common law, and given the different policy objectives of civil negligence and criminal law. *See Turnidge*, 359 Or at 472 n 62. Moreover, even assuming for the sake of argument that the legislature intended to import "substantial factor" causation, it is not clear what they would have understood "substantial factor" to mean because, as we will explain, that term was used in different ways during that time period, including in the authorities cited by the concurrence.

It is important to understand that in the 1960s, civil negligence law was evolving. Commentators and courts were trying to disentangle factual causation, which asks whether the defendant's conduct was a cause of the plaintiff's injury, from the other policy limits on the scope of liability that had been included within the element of proximate or legal cause. *See Turnidge*, 359 Or at 471 ("Legal or proximate cause *** expresses a policy judgment as to whether conduct that factually caused harm *should* result in liability or responsibility. The idea generally is that some conduct, although an actual cause of harm, nevertheless should not result in liability or responsibility for that harm." (Emphasis in original.)); *see also Stoneburner v. Greyhound Corp. et al*, 232 Or 567, 572, 375 P2d 812 (1962) ("'Legal cause,' or, 'proximate cause,' in its larger aspect, covers, in general, all of the limitations placed by the law upon the responsibility of a person for his negligent conduct." (Citing W. Page Keeton *et al*, *Prosser and Keeton on The Law of Torts* § 9, 252 (2d ed 1955).)).

The concurrence asserts that the term "substantial factor" was used to refer to factual causation. ___ Or at ___, ___, ___ (Bushong, J., concurring) (slip op at 9:3, 9:10, 12:14). But that was not how it was always used in the 1960s and 1970s. At times, this court used it to capture legal or proximate cause and concepts of relativity. For example, in *Sworden v. Gross*, 243 Or 83, 86, 409 P2d 897 (1966), this court stated that whether "proximate cause" existed depended on whether a defendant's negligence was "a substantial factor in bringing about the injury or damage in question." Similarly, in *Hills v. McGillvrey*, 240 Or 476, 482, 402 P2d 722 (1965), this court equated "substantial" and "proximate" cause. *See also Furrer v. Talent Irrigation District*, 258 Or 494, 511, 466 P2d 605 (1970) (stating that "[t]he term 'substantial factor' expresses a concept of relativity which is difficult to reduce to further definiteness").

Moreover, even when the term "substantial factor" was used in connection with factual causation, it was understood in different ways, as the authorities cited by the concurrence illustrate. Some of the authorities regarded "but for" causation as overinclusive and preferred "substantial

factor" causation as an alternative that excluded some causes that would satisfy the "but for" test. ___ Or at ___ (Bushong, J., concurring) (quoting Restatement (Second) of Torts § 431 comment a (1965)) (slip op at 12:8-12). But other authorities did not view the "substantial factor" test as excluding any "but for" causes and viewed the "substantial factor" test as an improvement in rare situations where conduct should satisfy the causation element but would fail the "but for" test, such as when there were two independently sufficient causes. ___ Or at ___ (Bushong, J., concurring) (citing Haas v. Estate of Mark Steven Carter, 370 Or 742, 750, 525 P3d 451 (2023)) (slip op at 8:8-13). Thus, even assuming that we should look to authorities from the 1960s and 1970s, those authorities used the term "substantial factor" in different ways. That fact would have been a reason for the legislature not to import the term into the criminal law.

The concurrence also cites post-1971 cases to support its view that the GEI statute requires "substantial factor" causation. ___ Or at ___, ___, ___ (Bushong, J., concurring) (slip op at 8:8 - 9:8, 10:14 - 12:2, 16:9 - 17:9). Of course, those cases cannot inform our understanding of what the 1971 legislature meant. The concurrence uses them to say that juries have been able to apply "substantial factor" causation. But those cases apply different versions of "substantial factor" causation. If "substantial factor" causation states different standards, then it is not a clear statement of any standard.

For example, sometimes "substantial factor" causation is understood as "but for" causation. *See*, *e.g.*, UCJI 59A.03 ("A substantial factor is one that made a difference in an employment decision; that is, the decision would not have been made without it. It need not be the only factor."); Comment to UCJI 59A.03 (noting that the Court of Appeals has described the standard as a "but for" test). Sometimes it is understood to exclude remote or trivial but-for causes. *See, e.g.*, California Civil Jury Instructions, CACI No. 430 (2024) (defining "substantial factor" as a cause that is "more than a remote or trivial factor"). And sometimes it is understood to supplement "but for" causation to capture conduct that should satisfy the causation element but would fail the "but

for" test. *See, e.g.*, *Turnidge*, 359 Or at 470 n 61 (the "substantial factor" test applies in those circumstances where the "but for" test "provides an inadequate test of cause-in-fact" (citing W. Page Keeton *et al*, *Prosser and Keeton on The Law of Torts* § 41, 266 (5th ed 1984))); *Haas*, 370 Or at 750-51 (same).

In addition, experience with "substantial factor" causation has led commentators and courts, including this one, to recommend tests and jury instructions that more directly address causation issues. *Restatement (Third)* § 27 comment b; *Haas*, 370 at 754 n 8, 757 n 9; *see* David W. Robertson, *The Common Sense of Cause in Fact*, 75 Tex L Rev 1765, 1776, 1780 (1997) ("[C]ourts seem to feel that it is appropriate to shift to the substantial factor vocabulary whenever the but-for test is proving difficult to work with for whatever reason. *** When courts begin turning to the substantial factor vocabulary in a broader range of cases [beyond multiple sufficient causes], valuable precision of analysis is lost and nothing is gained."). For example, in *Haas*, we noted that "a substantial factor instruction may not be the best way to instruct a jury on factual causation because of the ambiguity that it can create." 370 Or at 757 n 9 (citing Keeton, *Prosser and Keeton on The Law of Torts* § 41 at 268 (recommending directly instructing the jury on multiple sufficient causes rather than using substantial factor instruction) and *Restatement (Third)* § 27 comment b); *see also Haas*, 370 at 754 n 8 (noting that, in situations where a "substantial factor" test has been used to capture causes that would fail the "but for" test, such as a "multiple-sufficient-causal-set situation," it may be appropriate "to use an instruction that is specific to that situation rather than a typical but-for or substantial factor instruction.").

Finally, "a substantial factor instruction that informs a jury that, to find factual causation, it must find that a defendant's negligence was a 'substantial' or 'important' factor in causing the plaintiff's injury may be misleading." *Haas*, 370 Or at 755. Such an instruction

"*can lead a jury erroneously to believe that it must search for a most significant causal factor, when that is not required.* This court has made it plain that, in considering the

factual cause element of a negligence claim, the jury is not to examine whether one defendant's causal role was relatively more important than that of another defendant."

*Id.* at 755 (emphasis added).

Thus, the concurrence's "substantial factor" test would not provide the guidance that the concurrence says is needed. To the contrary, because "substantial factor" is undefined and can mean different things to different factfinders, and because it may cause factfinders to believe that they must quantify and compare relative contributions of different causes, the "substantial factor" test could cause uncertainty and confusion, and it could cause factfinders to believe—contrary to what the legislature intended, as evidenced by the text, context, and legislative history of the GEI statute—that the GEI defense does not apply unless a defendant proves that their mental disease or defect accounted for a specific (but unspecified) amount or portion of their lack of capacity.

## III.  CONCLUSION

Because the Court of Appeals erred in its conclusion regarding what a defendant must show to prove the required connection between their mental disease or defect and their lack of capacity, we again remand the case to the Court of Appeals.

The decision of the Court of Appeals is reversed, and the case is remanded to the Court of Appeals for further proceedings.

**BUSHONG, J.,** concurring.

The majority opinion concludes that the Court of Appeals erred in interpreting ORS 161.295, which required defendant to prove that his requisite lack of capacity occurred "as a result of " a mental disease or defect to establish his "guilty except for insanity" (GEI) defense. I agree with the majority opinion that the "sufficient by itself" test adopted by the Court of Appeals to establish that causal link was not what the legislature intended, and I agree with the majority opinion that, to establish a GEI defense, a defendant's mental disease or defect may combine with other conditions to cause

the required lack of capacity. I also agree that the appropriate disposition is to reverse and remand for further proceedings.

I write separately because, in my view, the majority opinion's conclusion that the dictionary definition of the word "result" is sufficient to define the causal link, neither reflects what the legislature intended nor provides enough guidance to mental health experts and trial courts when confronting the causation element of a GEI defense. Rather, when the legislature adopted ORS 161.295 as part of Oregon's Criminal Code in 1971, I conclude that it intended for courts to use substantial factor causation—which was widely used by Oregon courts at that time—as the causal link required to establish the GEI defense. In my view, that interpretation provides appropriate guidance to mental health experts and trial courts in resolving this complex factual issue.

The majority opinion declines to adopt substantial factor causation, concluding that (1) the absence of a "quantitative descriptor" in ORS 161.295(1) shows that the legislature did not intend to adopt substantial factor causation; (2) substantial factor causation is taken from civil negligence law, and we have cautioned against using civil negligence standards in the criminal law context; and (3) unlike the dictionary definition adopted by the majority opinion, substantial factor causation is unclear, would cause uncertainty and confusion, and could be misleading to juries. But the majority opinion reads too much into the absence of a "quantitative descriptor" in the statute, and not enough from the fact that substantial factor causation was widely used in civil negligence and other cases in the 1960s and 1970s. That fact alone suggests that the legislature intended to adopt substantial factor causation when it enacted ORS 161.295(1) in 1971. Many juries have applied substantial factor causation, suggesting that it is not as unclear, uncertain, confusing, or misleading as the majority opinion states. Those criticisms fairly apply to the majority opinion's approach because, although it defines the term "result," it declines to endorse *any* established legal test for the causation element of the GEI defense.

Ultimately, although the difference between our approaches boils down to the word "substantial," the

distance between them is relatively short. Under the majority opinion's decision, a defendant asserting a GEI defense could establish the defense if the factfinder concludes that their lack of capacity was "a result" or "a consequence" or "an effect" of a mental disease or defect. That appears to be just another way of saying that the mental disease or defect must be *a factor* in causing the requisite lack of capacity. Under the approach set forth below, to establish the GEI defense, a defendant's mental disease or defect must be *a substantial factor* in causing the requisite lack of capacity.

As I will explain, "substantial factor" is no less clear than the dictionary definition of "result" adopted by the majority opinion, and it is more likely what the legislature intended when it enacted ORS 161.295(1) in 1971 against the backdrop of well-established Oregon law at that time. The test is also demonstrably well-suited to juries evaluating the factual complexity of co-occurring mental conditions. Accordingly, I would conclude that, to prevail on a GEI defense, a defendant must prove that, when they committed the offense at issue, their mental disease or defect was a substantial factor in bringing about their lack of substantial capacity to appreciate the criminality of their conduct or to conform their conduct to the requirements of law. And I would remand this case to the Court of Appeals to decide whether the evidentiary record compelled a finding that defendant was GEI under that standard.

I begin with a brief explanation of why the majority opinion's dictionary definition provides no more clarity than substantial factor causation before turning to why substantial factor causation is what the legislature likely intended when it adopted the GEI statute.

## THE MAJORITY OPINION'S DICTIONARY DEFINITION

The first time we addressed this case, we determined that the Court of Appeals had erred in *State v. Meiser*, 308 Or App 570, 481 P3d 375 (2021) (*Meiser I*), when it concluded that "defendant could prevail on his GEI defense only if he proved that his co-occurring personality disorder played *no* part in causing the requisite lack of substantial

capacity." *State v. Meiser*, 369 Or 347, 361, 506 P3d 402 (2022) (*Meiser II*) (emphasis in original). We remanded to the Court of Appeals to address two unresolved questions: whether the evidence in the record compelled findings that (1) defendant lacked the substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the law; and (2) defendant lacked that requisite capacity "as a result of" a mental disease or defect. *Id.* We indicated that resolution of the second question "may turn on whether the phrase 'as a result of' in ORS 161.295(1) means that the qualifying 'mental disease or defect' must be sufficient, on its own, to bring about the requisite incapacity, or whether the legislature intended to require some lesser degree of causal contribution from the qualifying 'mental disease or defect.'" *Id.*

Thus, in *Meiser II*, we identified—but did not decide—another specific statutory interpretation issue regarding the GEI statute, directed the Court of Appeals to interpret that provision, and indicated that one interpretation that it could consider was the "sufficient by itself" standard that the Court of Appeals ultimately adopted. Now we reverse, indicating that the Court of Appeals erred in adopting an interpretation that we had suggested it could consider, and concluding that the dictionary definition of "result" is sufficient to define the necessary causal link.[1]

I do not see the point in allowing review twice in this case to interpret ORS 161.295(1) without clearly deciding what causal link the legislature intended. Nor do I think that a dictionary definition of the term "result" provides mental health experts and trial courts adequate guidance when they are confronted with a GEI defense. If the dictionary definition alone is sufficient, we could have just said so in our discussion of that definition when we first addressed the statutory interpretation question. *See Meiser II*, 369 Or at 360 (noting that the dictionary defines "result," when used as a noun, to mean "something that *results* as a consequence,

---

[1] In *Meiser II*, we explained that, to prove the affirmative defense of GEI under this statute, a defendant must establish that three elements existed at the time of engaging in criminal conduct: (1) a mental disease or defect; (2) a lack of substantial capacity either to appreciate the criminality of the conduct or to conform the conduct to the requirements of law; and (3) "a causal link between the two." 369 Or at 354.

effect, issue, or conclusion" (citing *Webster's Third New Int'l Dictionary* 1937 (unabridged ed 2002) (emphasis added))).

The fact that we did not decide the issue when we cited the dictionary definition in *Meiser II* implicitly suggests that the definition of the term "result" does not resolve the issue.[2] Moreover, "we have cautioned against relying solely on dictionary definitions to determine the meaning of statutory terms 'without critically examining how the definition fits into the context of the statute itself.'" *Marshall v. Pricewaterhouse Coopers, LLP*, 371 Or 536, 543, 539 P3d 766 (2023) (quoting *State v. Gonzalez-Valenzuela*, 358 Or 451, 461, 365 P3d 116 (2015)). That is because "[d]ictionary definitions lack context and often fail to capture the nuanced connotations conveyed by the normal use of a term in a particular context." *Gonzalez-Valenzuela*, 358 Or at 461. "Dictionaries, after all, do not tell us what words mean, only what words *can* mean, depending on their context and the particular manner in which they are used." *State v. Cloutier*, 351 Or 68, 96, 261 P3d 1234 (2011) (emphasis in original). And where, as here, a statute uses an ordinary word that has a specific legal significance, we typically do not rely solely on a dictionary definition. *See Kinzua Resources v. DEQ*, 366 Or 674, 681, 468 P3d 410 (2020) ("[C]onsulting a dictionary does not help us to resolve what the legislature intended the term 'controlling' to mean.").

If the dictionary definition of the word "result" alone provided the clarity to which the majority opinion aspires, then perhaps it would suffice to adopt that standard, notwithstanding our implicit suggestion in *Meiser II* that simply defining that term does not resolve the issue. But characterizing that definition as "plain, natural, and ordinary" does not make its meaning any clearer or more precise. A factfinder deciding whether a defendant's lack of substantial capacity at the time of the charged offense was a

---

[2] The majority opinion indicates we could not have resolved the meaning of "as a result of" in *Meiser II* because that would have "prejudged" an issue that the parties and the Court of Appeals had not yet addressed. ___ Or at ___ (slip op at 26: 8-10). But interpreting the statute is a legal question and we could have decided that question if we thought that a dictionary definition resolved the issue. My point is that our decision to remand in *Meiser II* after citing the dictionary definition of "result" suggests that we did not consider the dictionary definition of the statutory term to have provided an adequate and dispositive resolution.

"result," "consequence," or "effect" of the defendant's mental disease or defect in the context of a co-occurring personality disorder must still make a difficult assessment of the complex interactions of overlapping disorders that have challenged mental health experts for decades.[3] I do not see why the majority opinion believes that telling jurors to apply the dictionary definition of "result" will leave them any more certain or less confused than telling them to assess whether the defendant's mental disease or defect was a "substantial factor" in causing the requisite lack of capacity.

As I will explain, juries in Oregon and nationwide have decided cases using substantial factor causation in various contexts for many decades, demonstrating that substantial factor causation has not caused as much uncertainty or confusion as the majority opinion suggests. In my view, when the legislature adopted ORS 161.295(1) in 1971,[4] it intended to place this difficult decision in the hands of juries by applying an accepted legal test that was preferred by this court at the time. Additionally, a fair reading of the legislative history of the statute provides some support for the conclusion that the prevailing causation principle strikes the balance that the legislature intended when it enacted the GEI statute.

I summarize this court's case law applying substantial factor causation before turning to the legislative history of ORS 161.295.

### SUBSTANTIAL FACTOR CAUSATION

Our case law analyzing causation in civil and criminal cases has generally addressed two different tests, "but for" and "substantial factor" causation. In most cases, as we have recognized, the two tests lead to the same result, and

---

[3] As one commentator explained, "[t]he clinical ability to reliably distinguish the functional impact of impairments arising from personality disorders from those of other co-occurring mental disorders *** is simply not supported in clinical literature and experience." Robert Kinscherff, *Proposition: A Personality Disorder May Nullify Responsibility for a Criminal Act*, 38 J L Med & Ethics 745, 750 (2010); *see also* Natalie Abrams, *Definitions of Mental Illness and the Insanity Defense*, 7 J Psychiatry & L 441, 448-50, 453 (1979) (describing the difficulty in "show[ing] a causal connection between a 'mental illness' and a criminal act").

[4] We noted in *Meiser II* that the causation test—"'as a result of mental disease or defect at the time of engaging in criminal conduct'"—was included in the original statute that was enacted as part of the comprehensive Oregon Criminal Code of 1971. *Meiser II*, 369 Or at 356 (quoting Or Laws 1971, ch 743, § 36).

we have often used a but-for test to establish causation under both criminal and civil law. *State v. Turnidge (S059155)*, 359 Or 364, 470 n 61, 374 P3d 853 (2016) (noting that "[t]he two tests, in all but rare circumstances, lead to the same conclusion"); *Joshi v. Providence Health System*, 342 Or 152, 162, 149 P3d 1164 (2006) (pointing out that "the two standards produce the same result in most cases"). We recently stated, in *Haas v. Estate of Mark Steven Carter*, 370 Or 742, 751, 525 P3d 451 (2023), that "the substantial factor standard 'has not supplanted' the but-for standard of causation; rather, 'the two standards apply to different types of negligence cases.'" (Quoting *Joshi*, 342 Or at 162).

But we also recognized that there is "at least one situation in which a but-for instruction will not work." *Haas*, 370 Or at 749. We explained that substantial factor causation was developed "primarily for that circumstance—the situation in which the concurrent conduct of two or more causes combine to create an injury, and either one of those causes, operating alone, would have been sufficient to produce the same result." *Id.* at 750. We made the same observation in *Turnidge*, 359 Or at 470 n 61, and in *Joshi*, 342 Or at 161.

In *Joshi* we explained that substantial factor causation "is an improvement over the 'but for' rule for [that] special class of cases" and for "two other types of situations which have proved troublesome" for but-for causation. *Id.* (quoting W. Page Keeton, *Prosser and Keeton on The Law of Torts* 267-68 (5th ed 1984)). One situation is where "a similar, but not identical result would have followed without the defendant's act." *Id.* The other is where "one defendant has made a clearly proved but quite insignificant contribution to the result, as where he throws a lighted match into a forest fire." *Id.*

In those situations, we continue to apply substantial factor causation. In addition, substantial factor causation was routinely used in Oregon and nationwide during the 1960s and 1970s to establish factual causation in civil negligence cases. *See Elk Creek Management Co. v. Gilbert*, 353 Or 565, 584, 303 P3d 929 (2013) (noting that, when the Oregon Residential Landlord and Tenant Act was enacted in 1973, "this court used the 'substantial factor' test to determine the

'cause in fact' of a plaintiff's injuries"); *Restatement (Second) of Torts* § 431 (1965) (stating that a person's conduct causes harm to another if "his conduct is a substantial factor in bringing about the harm").[5]

Before 1971, Oregon juries regularly used substantial factor causation to decide factual causation under the common law. *Dewey v. A. F. Klaveness & Co.*, 233 Or 515, 541, 379 P2d 560 (1963) (O'Connell, J., concurring) (explaining the causation standard as "a substantial factor in physically producing the injury"); *Babler Bros. v. Pac. Intermountain*, 244 Or 459, 464-65, 415 P2d 735 (1966) (adopting the views of the concurring opinion in *Dewey* and holding that "it is for the trier of fact to say whether (a) the conduct complained of was a substantial cause of the harm, and (b) whether the conduct in question was negligent"); *Stewart v. Jefferson Plywood Co.*, 255 Or 603, 606, 469 P2d 783 (1970) (describing "[t]he scope of the liability of an actor whose conduct is a substantial factor in causing an injury"); *Furrer v. Talent Irrigation District*, 258 Or 494, 511, 466 P2d 605 (1970) (approving substantial factor jury instruction but noting that "[t]he term 'substantial factor' expresses a concept of relativity which is difficult to reduce to further definiteness").

In *Furrer*, we made it clear that "[t]he proper use of the substantial factor test" as adopted in the 1948 revision of the *Restatement* "has limited its application very definitely to the fact of causation alone." *Id.* at 510-11 (quoting Prosser on Torts § 49, 297 (3d ed 1964)). And in *Babler Bros.*, this court overruled prior precedent to make it clear that using substantial factor causation to establish factual causation "will, in most cases, avoid the conceptual debate about

---

[5] Substantial factor causation is a factual question to be decided by juries. *See Restatement (Second)* § 434(2)(a). That distinguishes it from the *Restatement*'s concepts of "legal" or "proximate" causation. Under the *Restatement*'s approach, legal or proximate cause presented a legal question that would be decided by courts as a matter of law. *Restatement (Second)* §§ 431, 453 (explaining that "legal cause" requires a court to decide whether there is any rule of law that relieves a negligent actor from liability "because of the manner in which his negligence has resulted in the harm" even if a jury could find that the actor's negligence was a substantial factor in causing the harm); *see also Hills v. McGillvrey*, 240 Or 476, 482, 402 P2d 722 (1965) (noting that the "difficulty" with the 1934 *Restatement*'s discussion of proximate cause "is that it assumes that it is the function of the court rather than of the jury" to determine proximate cause).

'proximate' cause, and will focus upon the proper function of the jury." 244 Or at 464-65.[6]

We have also applied the substantial factor standard to determine factual causation in two different types of medical malpractice cases. In *McEwen v. Ortho Pharmaceutical*, 270 Or 375, 528 P2d 522 (1974), the plaintiff alleged that she was harmed after using oral contraceptives that had been manufactured by two different pharmaceutical companies. This court held that "[t]he respective liability of multiple defendants depends upon whether the negligence of each was a substantial factor in producing the complained of harm." *Id.* at 418. In that context, we explained, the plaintiff need not show that each defendant's negligence was "sufficient to bring about the plaintiff's harm by itself;" rather, it was enough that each defendant "substantially contributed to the injuries eventually suffered by [the plaintiff]." *Id.*

In the other medical malpractice case, *Simpson v. Sisters of Charity of Providence*, 284 Or 547, 588 P2d 4 (1978), this court held that the trial court did not err in instructing the jury on substantial factor causation to determine whether plaintiff's injuries were caused by a hospital's negligent failure to take adequate x-rays of his spine. We explained that "[w]e have approved the use of the substantial factor formula in numerous cases" and concluded that, "'as applied to the fact of causation alone, no better test has been devised.'" *Id.* at 560 (quoting W. Prosser, Law of Torts 240, § 41 (4th ed 1971)).

Although substantial factor causation is no longer used as widely in civil negligence cases, as we noted in *Haas*, Oregon courts still routinely use substantial factor causation in employment discrimination cases. *See Holien v. Sears, Roebuck and Co.*, 298 Or 76, 90 n 5, 689 P2d 1292

---

[6] The majority opinion states that civil negligence law was "evolving" during the 1960s, and that substantial factor causation was used in different ways, with the court at times using the term to include the concepts of legal or proximate cause. ___ Or at ___ (slip op at 37:6-10). That was true during the 1950s and 1960s. But using "substantial factor" causation to include legal or proximate cause—which are matters that would be decided by the court—was the reason that this court in *Babler Bros.* overruled an earlier case that had misapplied the causation analysis. 244 Or at 464. And by 1970, when we decided *Furrer*, we made it clear that the proper use of substantial factor causation was limited to factual causation. 258 Or at 510-11.

(1984) (stating that "[a] common law or statutory cause of action for wrongful discharge emanating from sex discrimination is restricted to cases when sex is for no legitimate reason a substantial factor in the discrimination"); *Seitz v. State*, 100 Or App 665, 675, 788 P2d 1004 (1990) ("We use the 'substantial factor' test to determine whether [the] plaintiff's protected activities were the cause of [the] defendant's adverse [employment] actions.").[7]

Substantial factor causation was preferred in the 1960s and 1970s in part because, intuitively, it made sense in a way that was easy to understand. *See* Leon Green, *The Causal Relation Issue in Negligence Law*, 60 Mich L Rev 543 (1962) (arguing for widespread use of the substantial factor test because it avoids the hypothetical thinking required under the but-for test and directly applies the kind of judgments implicit in causal decision-making, thus yielding a lower rate of error)[8]; *Restatement (Second)* § 431 comment a (substantial factor test captures the common-sense understanding of causation, rather than the "philosophic sense" of causation represented by the but-for test, which could include events "so insignificant that no ordinary mind would think of them as causes").

In summary, our case law recognizes that a substantial factor test was widely used in civil negligence cases to establish factual causation during the 1960s and 1970s—contemporaneous with Oregon's enactment of ORS 161.295(1).[9] Additionally, that test is still used to determine

_____

[7] A uniform jury instruction used in employment discrimination cases states that "[a] substantial factor is one that made a difference in an employment decision; that is, the decision would not have been made without it. It need not be the only factor." UCJI 59A.03.

[8] Leon Green's article was cited favorably by the concurring opinion in *Dewey*, 233 Or at 544 (O'Connell, J., concurring) (stating that "the work of Leon Green most closely relates to the position which I have taken"). As noted above, this court later adopted the views expressed by Justice O'Connell in his *Dewey* concurrence. *See Babler Bros.*, 244 Or at 464-65 (citing concurring opinion in *Dewey* and adopting that approach because it avoids "the conceptual debate about 'proximate' cause and *** focus[es] upon the proper function of the jury").

[9] The majority opinion states that cases decided after the 1971 enactment of ORS 161.295(1) are irrelevant to determining the legislature's intent. I agree, but those cases are relevant to my point, which is that substantial factor causation has been applied by juries for decades, and that, as a test of factual causation, it is not as uncertain or confusing as the majority opinions suggests. In fact,

factual causation in employment discrimination and some civil tort cases because we have recognized that, in those situations, substantial factor causation is an improvement over but-for causation. As I will explain, analyzing whether a criminal defendant's lack of capacity was "a result of" a mental disease or defect in the context of co-occurring mental conditions presents another situation where substantial factor is the better test for factual causation.

The more common test, but-for causation, is typically applied when assessing the effects of discrete, readily separable links in a causal chain. *Turnidge*, 359 Or at 471 (conduct occurring "early in the chain of causation * * * may be a 'but-for' cause by resulting in a series of forces or events that follow to cause the injury, each of which is also a link in the causal chain without which the injury would not have resulted"). We concluded in *Turnidge* that, for purposes of criminal responsibility in general, "[t]he test of causation for most circumstances is whether, 'but for' the defendant's conduct, the event would not have occurred." 359 Or at 481. Where the specified result follows from such a chain of events, we explained, the defendant's role does "not have to be the last link in the chain, or the only one, for the jury to make that determination." *Id.* at 482.

Similarly, in the civil tort cases that use a but-for test, a jury is often asked to determine whether a defendant's conduct, or something else within a sequence of events, caused a plaintiff's injury, as in *Haas* and *Joshi*. But where a jury is called on to assess an individual's motivation, as in employment discrimination cases, we have consistently used substantial factor as the test for causation. *See, e.g.*, *Ossanna v. Nike, Inc.*, 365 Or 196, 214, 445 P3d 281 (2019) (applying substantial factor causation). Assessing a criminal defendant's mental condition to determine whether their lack of capacity was a result of a mental disease or defect is like evaluating an employer's motivation for an employment decision. Both circumstances require evaluating mental states that exist concurrently in a person's mind—which are neither discrete links in a causal chain, nor readily separable

---

by 1978, when we decided *Simpson*, we thought that "no better test has been devised." 284 Or at 560.

events or conditions. Analytically, that context is different from assessing whether one event in a chain caused a particular result, as is common in many criminal and civil cases. That is why, in my view, assessing a criminal defendant's co-occurring mental disorders is another situation where substantial factor causation is the superior standard.

The majority opinion declines to adopt substantial factor causation, noting that the legislature did not include a "quantitative descriptor" in the statute and the legislative history does not mention "substantial factor" causation at all.[10] Those observations are correct, and I do not dispute that they *could* mean that the legislature intended to reject substantial factor causation. But that is not the only interpretation, nor is it necessarily the most natural. Where, as here, the legislature uses the phrase—"as a result of"—to describe a causal link without defining the word "result" or discussing in the legislative history what it was intended to mean, we search for the intended meaning of the term in the context of the statute. The absence of any specific mention of "substantial factor" causation in the text or legislative history of the statute might mean that the legislature intended to reject it, as the majority opinion suggests. But it could also mean that the legislature did not consider or discuss the issue, or that it assumed that courts would apply the causation standard that was prevailing at the time.

The majority opinion also states that allowing juries to decide whether a criminal defendant is GEI using substantial factor causation would import civil tort law principles into the criminal law, contrary to our cautionary note in *Turnidge*. However, our cautionary note in that case primarily addressed the "difficulty with extending the

___

[10] The majority opinion notes that no party has advocated for using substantial factor causation for a GEI defense and suggests that defendant argued in favor of a dictionary definition. ___ Or at ___ n 6 (slip op at 26 n 6). Defendant argued that the Court of Appeals *misapplied* the dictionary definition but advocated for a "lesser degree" of causation than the "independent sufficiency" test adopted by the Court of Appeals. Defendant did not take a position on what that "lesser degree" should be, concluding that defining the causal link is not necessary because the record in this case shows that defendant's schizophrenia was "the predominant driver" of his behaviors. Thus, while it is true that no party advocated for using substantial factor causation, it is also true that no party contended that the dictionary definition alone should be used to define the causal link.

common-law doctrine of proximate cause in the criminal law context[.]" 359 Or at 472 n 62. I am not suggesting that we do that. But with due respect to our own admonition, we *should* import a civil tort principle into criminal law if we conclude that that is what the legislature intended.

The majority opinion further observes that, as we stated in *Haas*, instructing a jury on substantial factor causation can be misleading: "As the *Restatement (Third) of Torts* section 26 comment j (2010) points out, a substantial factor instruction may cause confusion because it can lead a jury erroneously to believe that it must search for a most significant causal factor, when that is not required." *Haas*, 370 Or at 755. But juries have been applying substantial factor causation in employment discrimination and certain civil negligence cases for decades. *See, e.g.*, *Lasley v. Combined Transport, Inc.*, 351 Or 1, 11, 261 P3d 1215 (2011) (jury determined whether defendant's spilling of glass panes onto the freeway was a substantial factor in causing the decedent's death); *Crosbie v. Asante*, 322 Or App 250, 255-56, 519 P3d 551 (2022) (noting that, to prevail on an employment discrimination or retaliation claim, a plaintiff must establish that a protected trait or activity "was a 'substantial factor'" in an adverse employment decision). Other courts have not found substantial factor causation to be too confusing. *See Mitchell v. Gonzales*, 54 Cal 3d 1041, 1052, 819 P2d 872 (1991) (describing substantial factor causation as "'sufficiently intelligible to any layman to furnish an adequate guide to the jury'" (quoting Prosser, *Proximate Cause in California*, 38 Cal L Rev 369, 379 (1950))). Any potential confusion in the context of a GEI defense can be avoided by instructing the jury that "substantial factor" causation does not mean that the jury is to compare the relative importance of multiple causes or search for the most significant causal factor.[11]

---

[11] Uniform Civil Jury Instruction 23.02 clarifies how juries are to apply the standard:

"Many factors may operate either independently or together to cause harm. In such a case, each may be a cause of the harm even though the others by themselves would have been sufficient to cause the same harm. If you find that defendant's act or omission was a substantial factor in causing the harm to the plaintiff, you may find that the defendant's conduct caused the harm even though it was not the only cause. A substantial factor is an important factor and not one that is insignificant."

The majority opinion suggests that substantial factor causation is unclear because the law does not define it. But as noted above, one of the reasons the law favored substantial factor causation at the time was the fact that it reflected a common-sense understanding that juries could apply without further definition. As we stated in *Simpson*, "as applied to the fact of causation alone, no better test has been devised." 284 Or at 560 (citing W. Prosser, *Law of Torts* § 41, 240 (4th ed 1971)). The fact that juries have been able to apply it without difficulty in many civil negligence and employment discrimination cases sufficiently demonstrates that no further definition is needed.

Ultimately, the majority opinion's dictionary definition of "result" and its misgivings about applying substantial factor causation in this context do not foreclose applying that standard to give effect to the legislature's intent when it enacted ORS 161.295(1) in 1971. And, as I will explain next, although the legislative history is not clear, its silence more likely indicates that the legislature intended for juries to use substantial factor causation in determining whether a criminal defendant was GEI when the defendant committed the charged offense.

### LEGISLATIVE HISTORY OF ORS 161.295

We explained in *Meiser II* that the "causal link" included in subsection (1) of ORS 161.295 was enacted in 1971 and was left unchanged by the 1983 amendment to subsection (2) of the statute. 369 Or at 359. The statute's context and legislative history shed some additional light on what the legislature intended in 1971 when it used "as a result of" to describe the causal link between a defendant's mental disease or defect and the requisite lack of capacity. We noted in *Turnidge* that Oregon had adopted the 1971 Criminal Code—including the GEI statute—"against the backdrop" of developments in the common law, including specifically Oregon's rejection of the concept of "proximate cause." *Turnidge*, 359 Or at 480. And, as noted above, that common law "backdrop" included the routine use of substantial factor causation to determine cause-in-fact.

It reasonably follows that the legislature would have intended to use the same causation standard that was widely used in 1971—substantial factor causation—as the causal link for the GEI defense. The legislative history of that statute does not clearly explain what causal link the legislature intended, as the majority opinion acknowledges. However, in my view, that history provides some support for concluding that substantial factor was the intended causal test.

The commentary to the 1971 Criminal Code revisions explains that ORS 161.295(1) was taken from section 4.01 of the Model Penal Code with a few minor changes in wording.[12] *See* Commentary to Criminal Law Revision Commission Proposed Oregon Criminal Code, Final Draft and Report § 36, 34 (July 1970). That commentary and the commentary to section 4.01 of the Model Penal Code both use the phrase "as a result of" repeatedly to describe the causal connection without clearly explaining what that phrase was intended to mean.[13] However, the commentary to section 4.01 also suggests that the drafters of the Model Penal Code were concerned, generally, about adopting a rule that allowed juries to apply the insanity defense too broadly.

That commentary explains why the drafters of the Model Penal Code declined to adopt the "*Durham*

---

[12] Section 4.01 of the Model Penal Code provides:

"(1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.

"(2) As used in this Article, the terms 'mental disease or defect' do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct."

[13] The commentary to section 4.01 of the Model Penal Code reveals that the drafters focused on the "substantial capacity" standard, not whether a lack of substantial capacity was "as a result of" a mental disease or defect. *See* Model Penal Code § 4.01 comment 3 at 172 (stating that the adoption of the substantial capacity standard "may well be the Code's most significant alteration of the prevailing tests[,]" acknowledging that "substantial" is "an open ended concept[,]" but concluding that it would be "sufficiently precise for purposes of practical administration"). The "substantial capacity" standard proposed in the Model Penal Code was partially adopted in *United States v. Currens*, 290 F2d 751, 774 (3d Cir 1961) ("The jury must be satisfied that at the time of committing the prohibited act the defendant, as a result of mental disease or defect, lacked substantial capacity to conform his conduct to the requirements of the law which he is alleged to have violated.").

rule"—based on *Durham v. United States*, 214 F2d 862 (DC Cir 1954)—even though that rule had been "warmly supported by psychiatrists at the time." Model Penal Code § 4.01 comment 3 at 173-74 (Official Draft and Revised Comments 1985). Under the *Durham* rule, "an accused is not criminally responsible if [their] conduct was *the product of* mental disease or defect." 214 F2d at 874-75 (emphasis added).[14] As they explain, the drafters of the Model Penal Code were concerned that using "the product of" to describe the causal link between a mental disease or defect and illegal conduct could be interpreted to mean "that the crime would not have been committed but for the presence of the mental disease or defect." Model Penal Code § 4.01 comment 3 at 173. In their view, "[that] interpretation [was] too broad" because it would capture motivations for criminal activity inspired by delusional beliefs or attitudes, even if the person's capacity to appreciate the criminality or wrongfulness of their conduct was not substantially impaired. *Id.*[15] Thus, the drafters of the Model Penal Code wanted to be clear that a defendant's lack of substantial capacity—not the illegal conduct itself—must occur "as a result of" the defendant's mental disease or defect.

Unfortunately, the drafters of the Model Penal Code did not elaborate on what "as a result of" was intended to mean, and the commentary to Oregon's revised Criminal Code does not explain what that phrase was intended to mean either. That commentary reveals only that Oregon, like the Model Penal Code, rejected the *Durham* rule in part because of the "troublesome causal questions" raised by its application. *See* Commentary § 36 at 36 ("Like the

___

[14] The DC Circuit later overruled *Durham* and adopted a rule based on section 4.01 of the Model Penal Code. *United States v. Brawner*, 471 F2d 969, 994-95 (DC Cir 1972).

[15] The Model Penal Code commentary offered an example. If a person murders a wealthy relative believing, as a result of a mental disease or defect, that they will inherit a large amount of money upon the relative's death, the murderer would be relieved of responsibility under a but-for test. But the murderer should still be held responsible, the commentary explains, if their capacity for understanding and control were not otherwise impaired by mental illness, because that situation would be morally indistinguishable from someone who does not have a mental illness and commits a murder to receive an inheritance. Model Penal Code § 4.01 comment 3 at 173 n 24.

Model Penal Code § 4.01, the *Currens* test[16] recognizes variations in degree and allows wide scope for expert testimony without the troublesome causal questions raised by *Durham*."). Rejecting the *Durham* rule and its potentially sweeping application suggests that the drafters of both the Model Penal Code and the Oregon statute were generally concerned about adopting a standard that permitted too broad an interpretation of the causal link between a mental disease or defect and a defendant's illegal conduct.

The majority opinion's dictionary definition would allow juries to find that a defendant was GEI at the time of the offense if the defendant's lack of substantial capacity was a "result" or "consequence" or "effect" of a mental disease or defect. In my view, because the legislature was concerned, generally, about an overbroad application of the GEI defense, it more likely intended that the mental disease or defect must be a *substantial* factor in causing a defendant's lack of capacity—not just a factor—consistent with the prevailing causation standard at the time.[17]

Because I agree with the majority opinion's disposition of this case, but disagree with some of its reasoning, I respectfully concur.

Nakamoto, S.J., joins in this concurring opinion.

**JAMES, J.,** concurring.

I join fully in the majority opinion except as to section E(3)(c).

Masih, J., joins in this concurring opinion.

---

[16] *See Currens*, 290 F2d at 774 (stating that "[t]he jury must be satisfied that at the time of committing the prohibited act the defendant, as a result of mental disease or defect, lacked substantial capacity to conform his conduct to the requirements of the law which he is alleged to have violated"). Like the commentary to the Model Penal Code and Oregon's 1971 revised Criminal Code, the *Currens* court did not discuss what it meant when it used the term "as a result of" to describe the required causal link.

[17] The fact that the majority opinion and this concurrence disagree about the causation analysis that should be used to establish a GEI defense suggests that further legislation clarifying the intended approach might be warranted.